# CADY, WARDEN *v.* DOMBROWSKI

No. 72–586.   Argued March 21, 1973—Decided June 21, 1973

REHNQUIST, J., wrote the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS, STEWART, and MARSHALL, JJ., joined, *post*, p. 450.

*LeRoy L. Dalton,* Assistant Attorney General of Wisconsin, argued the cause for petitioner. With him on the briefs was *Robert W. Warren,* Attorney General.

*William J. Mulligan,* by appointment of the Court, 410 U. S. 952, argued the cause for respondent. With him on the brief was *David E. Leichtfuss.*\*

Opinion of the Court by MR. JUSTICE REHNQUIST, announced by MR. JUSTICE BLACKMUN.

Respondent Chester J. Dombrowski, was convicted in a Wisconsin state court of first-degree murder of Herbert McKinney and sentenced to life imprisonment. The conviction was upheld on appeal, *State* v. *Dombrowski,* 44 Wis. 2d 486, 171 N. W. 2d 349 (1969), the Wisconsin Supreme Court rejecting respondent's contention that certain evidence admitted at the trial had been unconstitutionally seized. Respondent then filed a petition for a writ of habeas corpus in federal district court, asserting the same constitutional claim. The District Court denied the petition but the United States Court of Appeals for the Seventh Circuit reversed, holding that one of the searches was unconstitutional under *Preston* v. *United States,* 376 U. S. 364 (1964), and the other unconstitu-

---

\**Robert L. Shevin,* Attorney General, and *A. S. Johnston,* Assistant Attorney General, filed a brief for the State of Florida as *amicus curiae* urging reversal.

tional for unrelated reasons. 471 F. 2d 280 (1972). We granted certiorari, 409 U. S. 1059 (1972).

I

On September 9, 1969, respondent was a member of the Chicago, Illinois, police force and either owned or possessed a 1960 Dodge automobile. That day he drove from Chicago to West Bend, Wisconsin, the county seat of Washington County, located some hundred-odd miles northwest of Chicago. He was identified as having been in two taverns in the small town of Kewaskum, Wisconsin, seven miles north of West Bend, during the late evening of September 9 and the early morning of September 10. At some time before noon on the 10th, respondent's automobile became disabled, and he had it towed to a farm owned by his brother in Fond du Lac County, which adjoins Washington County on the north. He then drove back to Chicago early that afternoon with his brother in the latter's car.

Just before midnight of the same day, respondent rented a maroon 1967 Ford Thunderbird at O'Hare Field outside of Chicago, and apparently drove back to Wisconsin early the next morning. A tenant on his brother's farm saw a car answering the description of the rented car pull alongside the disabled 1960 Dodge at approximately 4 a. m. At approximately 9:30 a. m. on September 11, respondent purchased two towels, one light brown and the other blue, from a department store in Kewaskum.

From 7 to 10:15 p. m. of the 11th, respondent was in a steak house or tavern in West Bend. He ate dinner and also drank, apparently quite heavily. He left the tavern and drove the 1967 Thunderbird in a direction away from West Bend toward his brother's farm. On the way, respondent had an accident, with the Thunderbird breaking through a guard rail and crashing into a

bridge abutment. A passing motorist drove him into Kewaskum, and, after being let off in Kewaskum, respondent telephoned the police. Two police officers picked him up at a tavern and drove to the scene of the accident. On the way, the officers noticed that respondent appeared to be drunk; he offered three conflicting versions of how the accident occurred.

At the scene, the police observed the 1967 Thunderbird and took various measurements relevant to the accident. Respondent was, in the opinion of the officers, drunk. He had informed them that he was a Chicago police officer. The Wisconsin policemen believed that Chicago police officers were required by regulation to carry their service revolvers at all times. After calling a towtruck to remove the disabled Thunderbird, and not finding the revolver on respondent's person, one of the officers looked into the front seat and glove compartment of that car for respondent's service revolver. No revolver was found. The wrecker arrived and the Thunderbird was towed to a privately owned garage in Kewaskum, approximately seven miles from the West Bend police station. It was left outside by the wrecker, and no police guard was posted. At 11:33 p. m. on the 11th respondent was taken directly to the West Bend police station from the accident scene, and, after being interviewed by an assistant district attorney, to whom respondent again stated he was a Chicago policeman, respondent was formally arrested for drunken driving. Respondent was "in a drunken condition" and "incoherent at times." Because of his injuries sustained in the accident, the same two officers took respondent to a local hospital. He lapsed into an unexplained coma, and a doctor, fearing the possibility of complications, had respondent hospitalized overnight for observation. One of the policemen remained at the hospital as a guard, and the other, Officer Weiss, drove at some time after

2 a. m. on the 12th to the garage to which the 1967 Thunderbird had been towed after the accident.

The purpose of going to the Thunderbird, as developed on the motion to suppress, was to look for respondent's service revolver. Weiss testified that respondent did not have a revolver when he was arrested, and that the West Bend authorities were under the impression that Chicago police officers were required to carry their service revolvers at all times. He stated that the effort to find the revolver was "standard procedure in our department."

Weiss opened the door of the Thunderbird and found, on the floor of the car, a book of Chicago police regulations and, between the two front seats, a flashlight which appeared to have "a few spots of blood on it." He then opened the trunk of the car, which had been locked, and saw various items covered with what was later determined to be type O blood. These included a pair of police uniform trousers, a pair of gray trousers, a nightstick with the name "Dombrowski" stamped on it, a raincoat, a portion of a car floor mat, and a towel. The blood on the car mat was moist. The officer removed these items to the police station.

When, later that day, respondent was confronted with the condition of the items discovered in the trunk, he requested the presence of counsel before making any statement. After conferring with respondent, a lawyer told the police that respondent "authorized me to state he believed there was a body lying near the family picnic area at the north end of his brother's farm."

Fond du Lac County police went to the farm and found, in a dump, the body of a male, later identified as the decedent McKinney, clad only in a sportshirt. The deceased's head was bloody; a white sock was found near the body. In observing the area, one officer looked through the window of the disabled 1960 Dodge, located

not far from where the body was found, and saw a pillow-case, backseat, and briefcase covered with blood. Police officials obtained, on the evening of the 12th, returnable within 48 hours, warrants to search the 1960 Dodge and the 1967 Thunderbird, as well as orders to impound both automobiles. The 1960 Dodge was examined at the farm on the 12th and then towed to the police garage where it was held as evidence. On the 13th, criminologists came from the Wisconsin Crime Laboratory in Madison and searched the Dodge; they seized the back and front seats, a white sock covered with blood, a part of a bloody rear floor mat, a briefcase, and a front floor mat. A return of the search warrant was filed in the county court on the 14th, but it did not recite that the sock and floor mat had been seized. At a hearing held on the 14th, the sheriff who executed the warrant did not specifically state that these two items had been seized.

At the trial, the State introduced testimony tending to establish that the deceased was first hit over the head and then shot with a .38-caliber gun, dying approximately an hour after the gunshot wound was inflicted; that death occurred at approximately 7 a. m. on the 11th, with a six-hour margin of error either way; that respondent owned two .38-caliber guns; that respondent had type A blood; that the deceased had type O blood and that the bloodstains found in the 1960 Dodge and on the items found in the two cars were type O.

The prosecution introduced the nightstick discovered in the 1967 Thunderbird, and testimony that it had traces of type O blood on it; the portion of the floor mat found in the 1967 car, with testimony that it matched the portion of the floor mat found in the 1960 Dodge; the bloody towel found in the 1967 car, with testimony that it was identical to one of the towels purchased by respondent on the 11th; the police uniform trousers; and the sock

found in the 1960 Dodge, with testimony that it was identical in composition and stitching to that found near the body of the deceased.

The State's case was based wholly on circumstantial evidence. The Supreme Court of Wisconsin, in reviewing the conviction on direct appeal, stated that "even though the evidence that led to his conviction was circumstantial, we have seldom seen a stronger collection of such evidence assembled and presented by the prosecution." *State* v. *Dombrowski,* 44 Wis. 2d, at 507, 171 N. W. 2d, at 360.

## II

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The ultimate standard set forth in the Fourth Amendment is reasonableness. In construing this command, there has been general agreement that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara* v. *Municipal Court,* 387 U. S. 523, 528–529 (1967). See *Coolidge* v. *New Hampshire,* 403 U. S. 443, 454–455 (1971). One class of cases which constitutes at least a partial exception to this general rule is automobile searches. Although vehicles are "effects" within the meaning of the Fourth Amendment, "for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars." *Chambers* v. *Maroney,* 399 U. S. 42, 52 (1970). See *Carroll* v.

*United States,* 267 U. S. 132, 153–154 (1925). In *Cooper* v. *California,* 386 U. S. 58, 59 (1967), the identical proposition was stated in different language:

> "We made it clear in *Preston* [v. *United States*] that whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case and pointed out, in particular, that searches of cars that are constantly movable may make the search of a car without a warrant a reasonable one although the result might be the opposite in a search of a home, a store, or other fixed piece of property. 376 U. S., at 366–367."

While these general principles are easily stated, the decisions of this Court dealing with the constitutionality of warrantless searches, especially when those searches are of vehicles, suggest that this branch of the law is something less than a seamless web.

Since this Court's decision in *Mapp* v. *Ohio,* 367 U. S. 643 (1961), which overruled *Wolf* v. *Colorado,* 338 U. S. 25 (1949), and held that the provisions of the Fourth Amendment were applicable to the States through the Due Process Clause of the Fourteenth Amendment, the application of Fourth Amendment standards, originally intended to restrict only the Federal Government, to the States presents some difficulty when searches of automobiles are involved. The contact with vehicles by federal law enforcement officers usually, if not always, involves the detection or investigation of crimes unrelated to the operation of a vehicle. Cases such as *Carroll* v. *United States, supra,* and *Brinegar* v. *United States,* 338 U. S. 160 (1949), illustrate the typical situations in which federal officials come into contact with and search vehicles. In both cases, members of a special federal unit charged with enforcing a particular federal criminal

statute stopped and searched a vehicle when they had probable cause to believe that the operator was violating that statute.

As a result of our federal system of government, however, state and local police officers, unlike federal officers, have much more contact with vehicles for reasons related to the operation of vehicles themselves. All States require vehicles to be registered and operators to be licensed. States and localities have enacted extensive and detailed codes regulating the condition and manner in which motor vehicles may be operated on public streets and highways.

Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Although the original justification advanced for treating automobiles differently from houses, insofar as warrantless searches of automobiles by federal officers was concerned, was the vagrant and mobile nature of the former, *Carroll* v. *United States, supra; Brinegar* v. *United States, supra;* cf. *Coolidge* v. *New Hampshire, supra; Chambers* v. *Maroney, supra,* warrantless searches of vehicles by state officers have been sustained in cases in which the possibilities of the vehicle's being removed

or evidence in it destroyed were remote, if not non-existent. See *Harris* v. *United States,* 390 U. S. 234 (1968) (District of Columbia police); *Cooper* v. *California, supra.* The constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in "plain view" of evidence, fruits, or instrumentalities of a crime, or contraband. Cf. *United States* v. *Biswell,* 406 U. S. 311 (1972).

Here we must decide whether a "search"† of the trunk of the 1967 Ford was unreasonable solely because the local officer had not previously obtained a warrant. And, if that be answered in the negative, we must then determine whether the warrantless search was unreasonable within the meaning of the Fourth and Fourteenth Amendments. In answering these questions, two factual considerations deserve emphasis. First, the police had ex-

---

†Petitioner argued before this Court that unlocking the trunk of the Ford did not constitute a "search" within the meaning of the Fourth Amendment. The thesis is that only an intrusion, into an area in which an individual has a reasonable expectation of privacy, with the specific intent of discovering evidence of a crime constitutes a search. Compare *Haerr* v. *United States,* 240 F. 2d 533 (CA5 1957), with *District of Columbia* v. *Little,* 85 U. S. App. D. C. 242, 178 F. 2d 13 (1949), aff'd on other grounds, 339 U. S. 1 (1950). But see *Camara* v. *Municipal Court,* 387 U. S. 523 (1967). Arguing that the officer's conduct constituted an "inspection" rather than a "search," petitioner relies on our decision in *Harris* v. *United States,* 390 U. S. 234 (1968), to validate the initial intrusion into the trunk, and then the plain-view doctrine to justify the warrantless seizure of the items.

We need not decide this issue. Petitioner conceded in the Court of Appeals that this intrusion was a search. Inasmuch as we believe that *Harris* and other decisions control this case even if the intrusion is characterized as a search, we need not deal with petitioner's belated contention.

ercised a form of custody or control over the 1967 Thunderbird. Respondent's vehicle was disabled as a result of the accident, and constituted a nuisance along the highway. Respondent, being intoxicated (and later comatose), could not make arrangements to have the vehicle towed and stored. At the direction of the police, and for elemental reasons of safety, the automobile was towed to a private garage. Second, both the state courts and the District Court found as a fact that the search of the trunk to retrieve the revolver was "standard procedure in [that police] department," to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands. Although the trunk was locked, the car was left outside, in a lot seven miles from the police station to which respondent had been taken, and no guard was posted over it. For reasons not apparent from the opinion of the Court of Appeals, that court concluded that as "no further evidence was needed to sustain" the drunk-driving charge, "[t]he search must therefore have been for incriminating evidence of other offenses." 471 F. 2d, at 283. While that court was obligated to exercise its independent judgment on the underlying constitutional issue presented by the facts of this case, it was not free on this record to disregard these findings of fact. Particularly in nonmetropolitan jurisdictions such as those involved here, enforcement of the traffic laws and supervision of vehicle traffic may be a large part of a police officer's job. We believe that the Court of Appeals should have accepted, as did the state courts and the District Court, the findings with respect to Officer Weiss' specific motivation and the fact that the procedure he followed was "standard."

The Court of Appeals relied, and respondent now relies, primarily on *Preston* v. *United States,* 376 U. S. 364

(1964), to conclude that the warrantless search was unconstitutional and the seized items inadmissible. In that case, the police received a telephone call at 3 a. m. from a caller who stated that "three suspicious men acting suspiciously" had been in a car in the business district of Newport, Kentucky, for five hours; four policemen investigated and, after receiving evasive explanations and learning that the suspects were unemployed and apparently indigent, arrested the three for vagrancy. The automobile was cursorily searched, then towed to a police station and ultimately to a garage, where it was searched after the three men had been booked. That search revealed two revolvers in the glove compartment; a subsequent search of the trunk resulted in the seizure of various items later admitted in a prosecution for conspiracy to rob a federally insured bank. In that case the respondent attempted to justify the warrantless search of the trunk and seizure of the items therein "as incidental to a lawful arrest." *Id.*, at 367. The Court rejected the asserted "search incident" justification for the warrantless search in the following terms:

> "But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." *Ibid.*

It would be possible to interpret *Preston* broadly, and to argue that it stands for the proposition that on those facts there could have been no constitutional justification advanced for the search. But we take the opinion as written, and hold that it stands only for the proposition that the search challenged there could not be justified as one incident to an arrest. See *Chambers* v. *Maroney, supra; Cooper* v. *California, supra.* We believe that the instant case is controlled by principles

that may be extrapolated from *Harris* v. *United States, supra,* and *Cooper* v. *California, supra.*

In *Harris,* petitioner was arrested for robbery. As petitioner's car had been identified leaving the site of the robbery, it was impounded as evidence. A regulation of the District of Columbia Police Department required that an impounded vehicle be searched, that all valuables be removed, and that a tag detailing certain information be placed on the vehicle. In compliance with this regulation, and without a warrant, an officer searched the car and, while opening one of the doors, spotted an automobile registration card, belonging to the victim, lying face up on the metal door stripping. This item was introduced into evidence at petitioner's trial for robbery. In rejecting the contention that the evidence was inadmissible, the Court stated:

> "The admissibility of evidence found as a result of a search under the police regulation is not presented by this case. The precise and detailed findings of the District Court, accepted by the Court of Appeals, were to the effect that the discovery of the card was not the result of a search of the car, but of a measure taken to protect the car while it was in police custody. Nothing in the Fourth Amendment requires the police to obtain a warrant in these narrow circumstances.

> "Once the door had lawfully been opened, the registration card . . . was plainly visible. It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." 390 U. S., at 236.

In *Cooper,* the petitioner was arrested for selling heroin, and his car impounded pending forfeiture proceedings. A week later, a police officer searched the car

and found, in the glove compartment, incriminating evidence subsequently admitted at petitioner's trial. This Court upheld the validity of the warrantless search and seizure with the following language:

"This case is not *Preston,* nor is it controlled by it. Here the officers seized petitioner's car because they were required to do so by state law. They seized it because of the crime for which they arrested petitioner. They seized it to impound it and they had to keep it until forfeiture proceedings were concluded. Their subsequent search of the car—whether the State had 'legal title' to it or not—was closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained. The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it." 386 U. S., at 61–62.

These decisions, while not on all fours with the instant case, lead us to conclude that the intrusion into the trunk of the 1967 Thunderbird at the garage was not unreasonable within the meaning of the Fourth and Fourteenth Amendments solely because a warrant had not been obtained by Officer Weiss after he left the hospital. The police did not have actual, physical custody of the vehicle as in *Harris* and *Cooper,* but the vehicle had been towed there at the officers' directions. These officers in a rural area were simply reacting to the effect of an accident—one of the recurring practical situations that results from the operation of motor vehicles and with which local police officers must deal every day. The Thunderbird was not parked adjacent

to the dwelling place of the owner as in *Coolidge* v. *New Hampshire,* 403 U. S. 443 (1971), nor simply momentarily unoccupied on a street. Rather, like an obviously abandoned vehicle, it represented a nuisance, and there is no suggestion in the record that the officers' action in exercising control over it by having it towed away was unwarranted either in terms of state law or sound police procedure.

In *Harris* the justification for the initial intrusion into the vehicle was to safeguard the owner's property, and in *Cooper* it was to guarantee the safety of the custodians. Here the justification, while different, was as immediate and constitutionally reasonable as those in *Harris* and *Cooper:* concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle. The record contains uncontradicted testimony to support the findings of the state courts and District Court. Furthermore, although there is no record basis for discrediting such testimony, it was corroborated by the circumstantial fact that at the time the search was conducted Officer Weiss was ignorant of the fact that a murder, or any other crime, had been committed. While perhaps in a metropolitan area the responsibility to the general public might have been discharged by the posting of a police guard during the night, what might be normal police procedure in such an area may be neither normal nor possible in Kewaskum, Wisconsin. The fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, by itself, render the search unreasonable. Cf. *Chambers* v. *Maroney, supra.*

The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking "search" conducted here of a vehicle that was neither in the custody nor on

the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained. The Framers of the Fourth Amendment have given us only the general standard of "unreasonableness" as a guide in determining whether searches and seizures meet the standard of that Amendment in those cases where a warrant is not required. Very little that has been said in our previous decisions, see *Cooper* v. *California, supra, Harris* v. *United States, supra, Chambers* v. *Maroney, supra,* and very little that we might say here can usefully refine the language of the Amendment itself in order to evolve some detailed formula for judging cases such as this. Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not "unreasonable" within the meaning of the Fourth and Fourteenth Amendments.

## III

The Wisconsin Supreme Court ruled that the sock and the portion of the floor mat were validly seized from the 1960 Dodge. The Fond du Lac county officer who looked through the window of the Dodge after McKinney's body had been found saw the bloody seat and briefcase, but not the sock or floor mat. Consequently, these two items were not listed in the application for the warrant, but the Dodge was the item "particularly described" to be searched in the warrant. The warrant was validly issued and the police were authorized to search the car. The reasoning of the Wisconsin Supreme Court was that although these items were not listed to be seized in the warrant, the warrant was valid and in executing it the officers discovered the sock and mat in plain view and therefore could constitutionally seize them without a warrant.

The Court of Appeals held that the seizure of the two items on September 13 could not be justified under the plain-view doctrine. The reasoning of that court hinged on its understanding that the warrant to search the Dodge had been returned and was *functus officio* by the time Officer Mauer of the Crime Laboratory came upon the sock and the floor mat. The court stated:

"There was no continuing authority under the warrant issued the previous night [the 12th]. First, these items were not described in the warrant and presumably were not observed that night [the 12th]. Second, when the warrant was returned—before Mauer came on the scene—it was *functus officio*. A 'new ball game,' so to speak, began when Mauer made his 'inspection.' " 471 F. 2d, at 286.

The record is so indisputably clear that the return of the warrant was filed on the 14th, not sometime prior to Mauer's search on the 13th, that we are somewhat at a loss to understand how the Court of Appeals arrived at its factual conclusion. The warrant to search the Dodge was issued on the 12th, and, although a return of the warrant was prepared by a Fond du Lac County officer at some time on the 13th (whether before or after Mauer's search is impossible to determine), it was not filed in the state court until the 14th, at which time a hearing was held. The seizures of the sock and the floor mat occurred while a valid warrant was outstanding, and thus could not be considered unconstitutional under the theory advanced below. As these items were constitutionally seized, we do not deem it constitutionally significant that they were not listed in the return of the warrant. The ramification of that "defect," if such it was, is purely a question of state law.

We therefore need not reach the question of whether the seizure of the two items from the Dodge would have

been valid because the entire car had been validly seized as evidence and impounded pursuant to a valid warrant, cf. *Harris* v. *United States, supra; Cooper* v. *California, supra,* or whether a search of the back seat of this car, located as it was in an open field, required a search warrant at all. See *Hester* v. *United States,* 265 U. S. 57, 59 (1924).

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE STEWART, and MR. JUSTICE MARSHALL join, dissenting.

In upholding the warrantless search of respondent's rented Thunderbird, the Court purports merely to rely on our prior decisions dealing with automobile searches. It is clear to me, however, that nothing in our prior decisions supports either the reasoning or the result of the Court's decision today. I therefore dissent and would hold the search of the Thunderbird unconstitutional under the Fourth and Fourteenth Amendments.

The relevant facts are these. Respondent, an off-duty Chicago policeman, was arrested by police on a charge of drunken driving following a one-car automobile accident in which respondent severely damaged his rented 1967 Thunderbird. The car was towed from the scene of the accident to a private garage and, some two and one-half hours later, one of the arresting officers drove to the garage and, without a search warrant or respondent's consent, conducted a thorough search of the car for the alleged purpose of finding respondent's service revolver which was not on respondent's person and had not been found during an initial search of the car at the scene of the accident. In the trunk of the car, the officer found and seized numerous items that eventually linked respondent to the death of one Herbert McKinney and

ultimately contributed to respondent's conviction for murder.

The Court begins its analysis by recognizing, as clearly it must, that the Fourth Amendment's prohibition against "unreasonable searches and seizures" is shaped by the warrant clause, and thus that a warrantless search of private property is per se "unreasonable" under the Fourth Amendment unless within one of the few specifically established and well-delineated exceptions. *Almeida-Sanchez* v. *United States, ante*, p. 266; *Katz* v. *United States*, 389 U. S. 347, 357 (1967); *Camara* v. *Municipal Court*, 387 U. S. 523, 528–529 (1967). At the same time, the Court also recognizes that one of the established exceptions to the warrant requirement is the search of an automobile on the highway where there is probable cause to support the search and "where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll* v. *United States*, 267 U. S. 132, 153 (1925). See also *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971); *Chambers* v. *Maroney*, 399 U. S. 42 (1970); *Dyke* v. *Taylor Implement· Mfg. Co.*, 391 U. S. 216 (1968). But the search of the Thunderbird plainly cannot be sustained under the "automobile exception," for our prior decisions make it clear that where, as in this case, there is no reasonable likelihood that the automobile would or could be moved, the "automobile exception" is simply irrelevant. *Coolidge* v. *New Hampshire, supra*, at 461; *Carroll* v. *United States, supra*, at 156.

Another established exception to the warrant requirement is a search incident to a valid arrest. *Chimel* v. *California*, 395 U. S. 752 (1969). But the search of the Thunderbird cannot be sustained under this exception, because even assuming that such a search would have been within the permissible scope of a search incident to

an arrest for drunken driving, it is clear that under *Preston* v. *United States,* 376 U. S. 364, 368 (1964), "the search was too remote in time or place to have been made as incidental to the arrest."

A third exception to the warrant requirement is the seizure of evidence in "plain view." Thus, in *Harris* v. *United States,* 390 U. S. 234 (1968), we upheld the seizure of an automobile registration card that fell within plain view of a police officer as he opened the door of an impounded automobile to roll up the windows. But, as we cautioned in *Coolidge, supra,* at 466, "[w]hat the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." In *Harris,* the prior justification for the intrusion by the police was to roll up the windows and lock the doors "to protect the car while it was in police custody." 390 U. S., at 236. "[T]he discovery of the card was not the result of a search," we said, and "in these narrow circumstances" the "plain view" exception to the warrant requirement was fully applicable. In the present case, however, the sole purpose for the initial intrusion into the vehicle was to *search* for the gun. Thus, the seizure of the evidence from the trunk of the car can be sustained under the "plain view" doctrine only if the search for the gun was itself constitutional. Reliance on the "plain view" doctrine in this case is therefore misplaced since the antecedent search cannot be sustained.

Another exception to the warrant requirement is that which sustains a search in connection with the seizure of an automobile for purposes of forfeiture proceedings. In *Cooper* v. *California,* 386 U. S. 58 (1967), the Court upheld the warrantless search of an automobile after it had been lawfully impounded pursuant to a California statute mandating the seizure and forfeiture of any

vehicle used to facilitate the possession or transportation of narcotics. There, however, the police were authorized to treat the car in their custody as if it were their own, and the search was sustainable as an integral part of their right of retention. This case, of course, is poles away from *Cooper*. The Thunderbird was not subject to forfeiture proceedings. On the contrary, ownership of the car remained exclusively in respondent's lessor and the sole reason that the police took even temporary possession of the car was to remove it from the highway until respondent could claim it.

Clearly, therefore, the Court's decision today finds no support in any of the established exceptions. The police knew what they were looking for and had ample opportunity to obtain a warrant. Under those circumstances, our prior decisions make it clear that the Fourth Amendment required the police to obtain a warrant prior to the search. *Carroll* v. *United States, supra,* at 156. Thus, despite the Court's asserted adherence to the principles of our prior decisions, in fact the decision rests on a subjective view of what is deemed acceptable in the way of investigative functions performed by rural police officers. But the applicability of the Fourth Amendment cannot turn on fine-line distinctions between criminal and investigative functions. On the contrary, "[i]t is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior," *Camara* v. *Municipal Court, supra,* at 530, for "[t]he basic purpose of [the Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Id.,* at 528. Thus, the fact that the professed purpose of the contested search was to protect the public safety rather than to gain incriminating evi-

dence does not of itself eliminate the necessity for compliance with the warrant requirement. Although a valid public interest may establish probable cause to search, *Camara, supra,* and *See* v. *City of Seattle,* 387 U. S. 541 (1967), make clear that, absent exigent circumstances, the search must be conducted pursuant to a "suitably restricted search warrant." *Camara, supra,* at 539. See also *Almeida-Sanchez* v. *United States, supra.* And certainly there were no exigent circumstances to justify the warrantless search made of the Thunderbird. For even assuming that the officer had reason to believe that respondent's service revolver was in the Thunderbird, the police had left the car in the custody of a private garage and did not return to look for the gun until two and one-half hours later. Moreover, although the arresting officers were at all times aware that respondent was an off-duty Chicago policeman, the officers never once inquired of respondent as to whether he was carrying a gun and, if so, where it was located. I can only conclude, therefore, that what the Court does today in the name of an investigative automobile search is in fact a serious departure from established Fourth Amendment principles. And since in my view that departure is totally unjustified, I would affirm the judgment of the Court of Appeals invalidating the search of the Thunderbird and remand the case to the District Court for determination whether the evidence seized during the search of the Dodge and the farm was the fruit of the unlawful search of the Thunderbird. See *Alderman* v. *United States,* 394 U. S. 165 (1969); *Wong Sun* v. *United States,* 371 U. S. 471 (1963).