SUMMERS, Chief Justice
(dissenting).
Defendant Cary Anderson was charged with the possession of heroin, a controlled dangerous substance, contrary to Section 966(C) of Title 40 of the Revised Statutes. After trial by a jury of twelve he was found guilty as charged and sentenced to imprisonment for four years at hard labor. He appeals, relying upon his contention that the trial judge erroneously denied his pretrial motion to suppress the heroin as evidence.
Shortly after eleven o’clock on the night of January 25, 1978 Anderson drove his 1975 Dodge Van off the road into a ditch, colliding with a fence, a tree and a house at the corner of Highway 61 and Cormorant in East Baton Rouge Parish. Mary Anderson, defendant’s mother, was returning from a late prayer meeting when she saw people assembled near the site and recognized her son’s van in the ditch. She stopped and learned that defendant was unconscious. Soon thereafter defendant’s sister and State Police Trooper Steven Jones arrived. Jones summoned additional help while he surveyed the scene. In the meantime defendant had recovered consciousness. His appearance and incorrigible conduct indicated to Trooper Jones that he was intoxicated. Accordingly, Trooper Jones arrested him for driving while intoxicated and handcuffed him. He was advised of his rights.
Because defendant’s van was badly damaged and created an obstruction, it had to be removed from the highway. Jones asked defendant and his mother if they preferred any particular wrecker or should he call the next on the Troop’s list. They expressed no preference, and the trooper called a wrecker and, at the same time, an ambulance to transport defendant, who apparently had minor injuries, to the hospital for further examination and evaluation of his condition. When the ambulance arrived defendant was belligerent and did not want to leave the scene. Jones had to hold him down on the ambulance stretcher. However, because of his hostility, the driver refused to be involved and the ambulance departed, leaving defendant at the scene.
Defendant’s mother then agreed to take her son to the hospital, and defendant was *CMXIX induced to calm down by people at the scene. He embarked in his mother’s car and they proceeded toward the hospital. Before they had traveled a block, defendant was seen to fall from the car and to lay “raving and ranting” in the street. Consequently, defendant was locked in the rear of the patrol car, another ambulance was called, and defendant was sent to the hospital in the ambulance followed by his sister and Trooper Jones.
In the interim, when the wrecker arrived, defendant’s mother testified she asked the trooper if the wrecker could tow the van to her house. According to her testimony, the trooper referred her to the driver of the wrecker. She questioned him and he agreed. No witnesses were called to corroborate her testimony.
In the meantime Sergeant Spencer had arrived to assist Jones. When Jones left to accompany defendant to the hospital, Spencer stayed at the site of the accident to complete the investigation. He made photographs, took measurements and proceeded to inventory the contents of the van because, at the time, the vehicle was to be towed away by the wrecker. It was the policy of the department, he said, to inventory vehicles over which they had exercised supervision and control when that supervision ended and the wrecker took possession. Inventories served to protect the property of the accident victim and to avoid suits against the department in the event of missing articles.
Because the van was badly damaged the door on the driver’s side could not be opened. However, with some effort and assistance Spencer was able to open the door on the opposite side. Since the van had a Michigan license his first action upon entry was to open the glove compartment in search of the ownership papers. There he found a quart-size cellophane bag with smaller sandwich bags enclosed. Within the sandwich bags he found stamp-size tinfoil packets. When he viewed and tasted their contents he believed the white substance he found was heroin. While this entry into the van was being accomplished, defendant’s mother stood at Spencer’s side and seemed curious about what might be discovered. She indicated no dissatisfaction and made no protest. At no time did she object that the van was not being towed to her house. When the search was completed she went home for warmer clothes to combat the cold January night. Later she arrived at the hospital.
In view of his discovery, Spencer ordered the van towed to the police crime lab for a more detailed inventory, after which he left the site of the accident, called the narcotics officer to meet him and proceeded to the hospital. Upon arrival they tested the substance obtained by Spencer with chemicals brought by the narcotics officer confirming Spencer’s original analysis.
Spencer then sought out defendant who he found lying in the emergency room of the hospital with Trooper Jones standing at his bedside. Spencer’s position at the foot of the bed gave defendant an opportunity to observe the cellophane bags and tinfoil packets in Spencer’s hands. Seeing these objects, defendant declared that they were of no significance. They contained “a substance . . . that he had attempted to run a lick down on some friends of his,” he said, and the officers should take it to the crime lab to be analyzed. In effect, he explained, the substance was sugar, not heroin. Further laboratory analysis confirmed that the substance was heroin.
The constitutional protection against “unreasonable searches, seizures, or invasions of privacy” apply to automobiles. La. Const. Art. I, § 5. See U.S.Const. 4th Amend.; Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). These fundamental principles involving searches and seizure contained in our State and Federal Constitutions require as a general rule that a search warrant authorize the search or seizure of one’s person or property. To this general rule historical and practical exceptions have developed to justify warrantless searches under certain circumstances. The United States Supreme Court has explicitly held that it is not an unreasonable search which offends the *CMXX Fourth Amendment to the Constitution when a car is impounded as part of standard police procedure in making reasonable “inventory searches,” to protect a car owner’s property, to protect the police against claims over lost or stolen property or to protect the public who might be endangered if an intruder were to remove a dangerous weapon from a car. South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). See also Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).
In Opperman defendant’s car was illegally parked along a downtown street and had received two tickets when a police officer decided to have the car towed to the city impound lot. He noticed certain items of personal property located in the car and so unlocked it and inventoried its contents, including the contents of an unlocked glove compartment in which marijuana was found. In upholding this inventory search, the United States Supreme Court wrote:
“In the interests of public safety and as part of what the Court has called ‘community caretaking functions,’ Cady v. Dombrowski, supra, 413 U.S. at 441, 93 S.Ct. at 2528, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

“The Vermillion police were indisputably engaged in a caretaking search of a lawfully impounded automobile. Cf. United States v. Lawson, 487 F.2d 468, 471 (CA8 1973). The inventory was conducted only after the car had been impounded for multiple parking violations. The owner, having left his car illegally parked for an extended period, and thus subject to impoundment, was not present to make other arrangements for the safekeeping of his belongings. The inventory itself was prompted by the presence in plain view of a number of valuables inside the car. As in Cady, there is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive.”
This Court has also had occasion to consider the “reasonableness” of inventory searches and has generally recognized that true inventory searches, that is, those not used as a subterfuge for conducting a war-rantless search for the primary purpose of obtaining evidence of crime, are constitutionally permissible. State v. Rome, 354 So.2d 504 (La.1978); State v. Jewell, 338 So.2d 633 (La.1976). The totality of the circumstances surrounding the search is examined by the Court to determine if a legitimate inventory search actually took place. State v. Hatfield, 364 So.2d 578 (La.1978).
Here a tow truck was called before commencing the search and it had been agreed (according to defendant’s mother) that the van would be towed to her house. At no time did the mother object to the search conducted in her presence, or to Sergeant Spencer’s order to tow the van to the crime lab. Even after the search defendant admitted possession and ownership of the bags and their contents and urged the officers to have the contents analyzed, claiming it was sugar. At no time did he object to the search, although he claimed that the search had been accomplished while he was at the site of the accident.
Nothing was unreasonable about this search, it was conducted according to regu *CMXXI lations in an orderly and ordinary manner free from abusive, forceful or deceptive conduct on the part of the law enforcement officers engaged in this vital service. There was no subterfuge employed to conduct a warrantless search.
I would uphold the ruling of the trial judge and sustain defendant’s conviction on sentence.