**UNITED STATES of America,**

v.

**Robert C. WEXLER.**

**Crim. No. 85–469.**

United States District Court,
E.D. Pennsylvania.

March 7, 1986.

**250**

Paul Sarmousakis, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Holly Maguigan, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Defendant, Robert C. Wexler, has moved to suppress physical evidence seized from his person and an automobile. He has also moved to suppress the identification testimony of three government agents. At the conclusion of the evidentiary hearing on February 3 and 4, 1986, I reserved decision on the physical evidence and denied suppression of the identification evidence. Additionally, I considered defendant's various motions *in limine*. This memorandum and order will supplement the rulings made in the courtroom.

Defendant is charged with conspiracy and possessing with intent to distribute approximately 750 pounds of hashish. The hashish, concealed inside of 640 motor mounts, was shipped in thirty-two crates from Bombay, India to Media, Pennsylvania. Customs agents in San Francisco, California, discovered the contraband when the shipment entered the country and transferred the crates to Customs in Philadelphia. Undercover agents delivered the crates to the addressee, Quality Traders, and DEA and Customs agents maintained continuous surveillance over the building where Quality Traders was located.

After two days, the crates were loaded into a Ryder truck which the agents followed in several unmarked cars to a Dunkin' Donuts parking lot and then to a K Mart parking lot. Agents maintained surveillance of the K Mart area until Agent Ellis M. Hershowitz, one of the officers coordinating the operation, arrested Wexler who, for thirty minutes, had been continuously driving a white Ford Tempo in the immediate area surrounding the K Mart. The occupant of the passenger's seat, co-defendant Louis B. Samuels, was also arrested.

At the time of the arrest, Agent Hershowitz observed a CB radio, its box, a receipt for its purchase, a Dunkin' Donuts bag and coffee cup, a small leather coin purse, and a plastic bag in the passenger compartment of the automobile. These items and rental documents bearing Wexler's name, located in the glove compartment, were seized several hours later during an inventory search at the DEA office. Wexler's wallet, containing personal identification, was also seized at the DEA office during the processing incident to a custodial arrest. It was later determined that the substance inside of the plastic bag was marijuana and, one year later, trace amounts of hashish were discovered on two coins inside of the leather coin purse.

Defendant has moved to suppress all of this evidence on the basis that his arrest was invalid for lack of probable cause. Consequently, he argues, the warrantless searches of the automobile, the containers therein, and the defendant's person were invalid.

I have concluded that Agent Hershowitz had probable cause to arrest defendant. In

making this determination, I have considered only the following facts which Agent Hershowitz, the arresting officer, identified as being within his knowledge at the time of the arrest.[1] Thirty-two crates of hashish were sent from India, delivered to Quality Traders and loaded into a Ryder truck. The truck was eventually driven to a K Mart parking lot where the driver parked away from other vehicles, walked to the front entrance of the store and began "pacing around and looking around." Minutes after the Ryder truck was parked, a white Ford Tempo slowly passed in close proximity to the truck. The white Tempo continuously circled the K Mart area for approximately thirty minutes and passed the truck a second time. Agents had earlier observed the same white Tempo, identified by its license plate, drive by Quality Traders while the crates were being loaded onto the truck. The agents concluded that the driver of the white Tempo was conducting counter-surveillance of the Ryder truck.[2]

These facts are sufficient to establish probable cause to arrest Wexler. The arresting officer knew that a narcotics offense was in the process of being committed. The driver of the truck appeared to be waiting to meet another party outside of the K Mart. A white Tempo arrived at this critical time; its driver demonstrated more than casual interest in the truck as he slowly cruised past it twice and circled the immediate area for thirty minutes. The agents noted that the same automobile had passed the truck at a critical time several hours earlier when the contraband was being loaded into the truck at Quality Traders. This coincidence of timing and location, together with the peculiar manner in which the automobile was being operated at the K Mart, justified the agent's reasonable conclusion that the driver of the automobile was not a curious shopper, but rather was conducting counter-surveillance of the truck. When this conclusion was added to the knowledge that the truck was presently transporting contraband, the agents had sufficient probable cause to arrest the defendant. At that point, the defendant was linked with the truck and the contraband, and the agents were warranted in the belief that defendant's counter-surveillance activity was for the purpose of furthering the ongoing narcotics offense. *See Brinegar v. United States*, 338 U.S. 160, 175–178, 69 S.Ct. 1302, 1310–1312, 93 L.Ed. 1879 (1949). Consequently, Wexler's arrest was valid and the seizures of physical evidence were justified as inventory or admin-

---

1. Specifically, I have relied on the following statements: the affidavits attached to the search warrants for Quality Traders and the Ryder truck; the affidavit attached to the complaint and warrant for Wexler's arrest; the testimony at the October 26, 1984, preliminary hearing; and, the testimony at the February 4, 1986, evidentiary hearing. In these sworn statements Agent Hershowitz identified information he obtained through personal observation and through radio broadcasts from other agents involved in the surveillance. *See United States v. Webster*, 750 F.2d 307, 323 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985) (arresting officer does not need personal knowledge of all facts when collective knowledge obtained through communication with other officers establishes probable cause).

2. "The Supreme Court has made it clear that the expertise and experience of the officer are to be taken into account in applying the Fourth Amendment probable cause test." (footnotes omitted) 1 *W. LaFave, Search and Seizure A Treatise on the Fourth Amendment* § 3.2 at 462 (1978). The Third Circuit, however, has stated that "[t]he standard is not what a police officer trained in a particular field would conclude, but rather it is what a reasonable, prudent man would conclude." (footnote omitted) *United States v. 1964 Ford Thunderbird*, 445 F.2d 1064, 1068 (3d Cir.1971), *cert. denied*, 405 U.S. 964, 92 S.Ct. 1181, 31 L.Ed.2d 239 (1972). A leading commentator has interpreted this language as requiring that the officer "explain his expertise and how it bears upon the facts which prompted the officer to arrest or search." 1 *W. LaFave, Search and Seizure* § 3.2 at 463 (1978).

While the arresting officer made a general claim of expertise, he did not explain how his experience and training influenced his assessment of the facts. Therefore, I do not accord any weight to his conclusion as an expert. Nevertheless, I conclude that a reasonable, prudent person, without special expertise in narcotics investigations, would infer on these facts that the driver of the white Tempo was conducting counter-surveillance of the truck. Thus, I credit the arresting officer's conclusion to this extent.

istrative searches conducted pursuant to a lawful custodial arrest, *see Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), and the impoundment of a vehicle.[3] *See South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

I do not reach the question as to whether the subsequent searches of the contents of the plastic bag and leather coin purse were valid, because this evidence will be excluded on other grounds. *See infra* at 253. Accordingly, all of the physical evidence, except for these two containers, will be admitted.

Defendant has also moved to suppress the identification testimony of Agents Sammoccicia, McCloskey, and Cessaro on the basis that each agent's identification of the defendant after his arrest was the product of impermissibly suggestive procedures and is without adequate, independent basis. I have denied defendant's motion.

At the evidentiary hearing, Agent Michael A. Sammoccicia testified that, while conducting surveillance in the Dunkin' Donuts parking lot, he saw two men talking outside of a white automobile which was parked in the area of the Ryder truck. It was about four o'clock in the afternoon. He observed the men for five to ten seconds from a distance of approximately twenty yards and noticed that one had dark, straight hair with a red shirt and the other man was thin, had dark, bushy hair with a mustache and was wearing a light-colored shirt and no glasses. He noted that the men "looked suspicious" and conveyed the information to his partner. He did not see the men again until approximately four hours later when he heard that two men had been arrested near the K Mart, and he went to the DEA office to see if he could make an identification. When Agent Sammoccicia saw the two arrested men, who were in separate rooms, he stated that he was "ninety percent certain" that they were the same two men he had seen at the Dunkin' Donuts.

Two other members of the surveillance team, Agents Richard McCloskey and Frank Cessaro, testified that they saw Wexler and Samuels in the K Mart area. Agent McCloskey stated that as he entered the store, he saw a man with full, curly hair and a mustache talking on the telephone in the front entrance. The agent made eye contact as the man gave a "darting glance." When the agent left the store about ten minutes later, he noticed the same person talking outside the front of the store to a man with medium length brown hair, wearing glasses, a red shirt and jeans. The agent again spotted these two men and observed their faces when they drove by him in a white Ford Tempo as the agent walked to his car parked on an adjacent street. Shortly thereafter, Agent McCloskey learned over the radio that a white car and two men were in custody at K Mart. He went to K Mart and identified the defendants as the same two men he had observed fifteen minutes earlier. These events occurred between four and five in the afternoon.

Agent Cessaro's testimony corroborated that of Agent McCloskey. In the mid-afternoon, Agent Cessaro observed two white males conversing in front of the K Mart entrance while they looked throughout the parking lot. Both men appeared to be in their early thirties. One had dark hair, a red shirt, dark pants and was clean shaven; the other had dark, longer, bushier hair, and a bushy mustache. One man went into the store while the other paced in front of the store. The agent observed the men from approximately thirty yards for five to ten minutes. At times his view was clear

---

**3.** Alternatively, the CB radio, its box and receipt, and the Dunkin' Donuts bag and coffee cup could have been seized under the plain view exception, *see Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 1539–1544, 75 L.Ed.2d 502 (1983), and all of the physical evidence could have been seized as a search incident to arrest. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

and at times it was partially obstructed by other vehicles in the parking lot. Agent Cessaro left the K Mart, but returned when he heard that an arrest had been made and, upon seeing the defendants, he identified them as the same two men he had seen at the store a half-hour earlier.

In evaluating the identification testimony I have assumed, without deciding, that the identification procedure was *unnecessarily* suggestive. *See Manson v. Brathwaite,* 432 U.S. 98, 104–117, 97 S.Ct. 2243, 2247–2254, 53 L.Ed.2d 140 (1977). While I seriously doubt that this is the case when surveillance agents identify persons at the scene of the arrest or shortly thereafter, this assumption allows me to reach the second level of inquiry, which is to balance the reliability of the identification against the features of suggestiveness.

In *Manson,* the Supreme Court set forth five criteria for assessing the reliability of identification evidence. 432 U.S. at 114–117, 97 S.Ct. at 2253–2254. Judging each agent's testimony against these criteria indicates that the indicia of reliability outweighs the suggestive elements of the identification. First, all three agents viewed the defendants in broad daylight for a period ranging from ten seconds to ten minutes, and from a maximum distance of thirty yards. Their views were, for the most part, unobstructed. Second, the observers were special agents who were maintaining surveillance of the Ryder truck and were making conscious observations of persons in the vicinity for the specific purpose of later apprehending whoever was involved in transporting the contraband. Third, the agents each possessed a high degree of certainty concerning the identification of the defendants. While the record does not contain statements made by Agents McCloskey and Cessaro at the time of identification, they each testified unequivocally at the evidentiary hearing that the two men arrested were the same two men they had observed earlier. Agent

Sammoccicia stated at the identification that he was ninety percent sure that the two men were the same. Fourth, the time between the first observation and the identification ranged from fifteen minutes to four hours. Finally, although the record contains no pre-confrontation descriptions, I nevertheless conclude that the totality of the circumstances indicates that the identification testimony is reliable. *See Bass v. Scully,* 562 F.Supp. 905 (S.D.N.Y.1983) (identification testimony admitted where witness could give no pre-identification description because the identification possessed other indicia of reliability). Whatever suggestiveness was present, did not create a "substantial likelihood of irreparable misidentification." *Manson,* 432 U.S. at 116, 97 S.Ct. at 2254. Because the challenged identifications are reliable, testimony as to them or subsequent identifications by the agents is admissible. *Id.,* 432 U.S. at 110 n. 10, 97 S.Ct. at 2251 n. 10. I have, therefore, denied defendant's motion to suppress the identification testimony.[4]

Defendant has also made various motions *in limine.* First, defendant has moved to exclude evidence of the marijuana contained in the plastic bag found on the floor of the front passenger's seat and the trace amounts of hashish between two coins inside of a leather coin purse found between the two front seats. I reserved ruling on this motion at the evidentiary hearing.

The small amounts of contraband found in the automobile have questionable probative value for two reasons: the government has neither shown that they were connected with the contraband contained in the truck nor that they belonged to Wexler rather than the co-defendant. At the same time, this evidence may confuse the jury as to the central issues in this case. Accordingly, I will grant defendant's motion and exclude the evidence under Fed. R.Evid. 403.

4. Because I have concluded that the identification testimony is admissible despite unnecessary suggestiveness in the identification procedure, the testimony is, *a fortiori,* admissible in the absence of unnecessary suggestiveness.

Second, defendant has moved to exclude evidence of the importation of the hashish on the basis that Wexler is charged with conspiracy and possession with intent to distribute and not with importation. Thus, defendant argues, this evidence is more prejudicial than probative.

 I have denied defendant's motion on the basis that the evidence of importation is part of the entire scheme to which Wexler allegedly was a party and is both relevant and necessary to place into context Wexler's alleged involvement, which is defined by the specific charges against him. The government's surveillance over the thirty-two crates, first at Quality Traders and then in the Ryder truck, can not be understood apart from the knowledge that Customs agents had previously discovered contraband in these crates at the United States border. Moreover, defendant has failed to show that this evidence is likely to consume too much court time, enflame or mislead the jury. To the contrary, the evidence of the importation of hashish is prejudicial to the defendant precisely because it is probative of the existence of a sub-agreement to possess and distribute the hashish. Consequently, this highly probative evidence will be admitted and any confusion between importation and possession with intent to distribute may be cured with a jury instruction.

Finally, the defendant has requested the court to rule *in limine* as to whether the government will be permitted to cross examine defendant's character witnesses concerning the presence of the contraband in the automobile and a 1974 conviction for possession of a small amount of marijuana in Nassau. The scope of cross examination of a character witness largely depends upon the scope of direct testimony which, in turn, is determined by the specific question posed and the response given. Because it is impossible, in my opinion, for the defendant to submit a precise offer of proof as to what will be the scope of direct testimony at trial, and because I cannot decide the scope of cross-examination in a

void, I have denied defendant's motion to rule on this issue *in limine*.