KITCHENS, Justice, concurring in result only:
¶ 19. While I concur with much of the analysis and with the result reached by the plurality, I write briefly to express, with respect, my disagreement with the plurality’s unequivocal adoption of the so-called community caretaking function as a standard to be employed by Mississippi courts in determining whether police stops of motorists on public thoroughfares are reasonable in the context of established search and seizure law.
¶ 20. The plurality cites Floyd v. City of Crystal Springs, 749 So.2d 110, 118 (Miss.1999), as having recognized the doctrine of community caretaking by police, yet notes that Floyd was decided under the reasonable suspicion standard. Plur. Op. at ¶ 18. It is important to emphasize that the community caretaking language in Floyd was mere dicta, and in no way adopted this judicial contrivance as a standard that should apply to police stops of motorists.
¶ 21. Moreover, it is important to note that the facts in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), on which the plurality relies in adopting the community caretaking function, are vastly different from those in the present case. In Cady, the defendant was involved in a motor vehicle accident and telephoned police. Id. at 435-36, 93 S.Ct. 2523. The responding officers picked up the defendant at the tavern from which he had placed the call, drove him back to the scene of the accident, and en route, noted that the defendant appeared intoxicated. Id. at 436, 93 S.Ct. 2523. The defendant informed the officers that he was an off-duty policeman; and upon their arrival at the disabled vehicle, officers searched his car under the pretense of locating the defendant’s service revolver. Id. No revolver was found, and the disabled vehicle was towed from the roadside to a privately owned garage. Id. The defendant was eventually arrested and charged with driving under the influence of alcohol and later was hospitalized due to injuries sustained in the accident. Id. Operating under standard departmental procedure, one of the arresting officers then performed an inventory search of the defendant’s impounded vehicle, claiming to be looking for the service revolver. Id. at 437, 93 S.Ct. 2523. The search of the vehicle and trunk revealed not the revolver but evidence and instrumentalities of an unrelated crime. Id.
¶ 22. In finding that this was a reasonable search under the Fourth Amendment, the Supreme Court emphasized the following facts: the vehicle was disabled by an accident, the driver was intoxicated and unable to make arrangements to move the vehicle, the vehicle’s presence alongside the highway was a nuisance, the police had a form of custody over the vehicle after its having been towed to the garage, the search of the vehicle for the revolver was an exercise in public safety to prevent the defendant’s service revolver from falling into the wrong hands, and the search of an impounded vehicle was standard procedure for the police department. Id. at 442-43, 93 S.Ct. 2523. These facts are wholly distinguishable from the present case, in which Officer Picau made a traffic stop of a functional vehicle based upon a mere suspicion that Trejo was either intoxicated or drowsy. In the instant case, there was no accident requiring Picau’s assistance, there was no disabled vehicle on a road *692 side, and there was no standard-procedure, inventory search of an impounded vehicle.
¶ 23. The plurality states: “[W]e conclude that the community caretaking function in Cady may apply in contexts other than inventory searches, as the police provide many functions apart from investigating criminal activity.” Plur. Op. at ¶ 14 (emphasis added). However, the present case was not an instance in which a peace officer was acting in a capacity apart from investigating criminal activity, since Officer Picau testified that, despite any indication (i.e., of a traffic violation, or erratic driving), he suspected Trejo of being either drowsy or intoxicated and made the stop to “check the status on” Trejo.
¶ 24. The danger in expanding this community caretaking function to apply to governmental searches and seizures where traffic stops have been made in the interest of public safety is that officers who have no reasonable belief that there is an imminent threat of danger to the driver or other members of the public will be empowered to make traffic stops of motorists who have not violated the law in any way. Thus, any imaginable activity a police officer subjectively thinks could possibly be dangerous — including acts the legislature has not seen fit to prohibit by law, such as cell phone use or eating a sandwich — will provide justification for a police stop. Indeed, it is the legislature’s constitutional responsibility to decide whether such activities are to be deemed threats to public safety. It is not the role of this Court to legalize police stops of motorists who have neither committed some violation of established traffic law nor are threatened by some imminently dangerous situation.
¶ 25. The reasonableness of traffic stops should continue to be analyzed under traditional Fourth Amendment jurisprudence. “Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a ‘seizure’ of ‘persons’ ” under the Fourth Amendment. Whren v. U.S., 517 U.S. 806, 809-810, 116 S.Ct. 1769, 1772 135 L.Ed.2d 89 (1996) (citations omitted). “An automobile stop is ... subject to the constitutional imperative that it not be ‘unreasonable’ under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.” Id. at 810, 116 S.Ct. 1769 (citing Delaware v. Prouse, 440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); Pennsylvania v. Mimms, 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)).
¶ 26. No one, of course, reasonably could question a police officer’s right— indeed, obligation — to stop a motorist when the officer reasonably perceives an imminent threat of harm to the motorist or other members of the public. Examples would include the officer’s observing lug nuts missing from a vehicle’s wheel, an automobile traveling toward a washed-out bridge, or gasoline leaking from a car or truck.[35] In cases when such stop is challenged, the officer must establish to the satisfaction of a judge that his or her perception of imminent threat of harm was reasonable.
¶ 27. In the instant case, the officer conceded that, at the time of the stop, no *693 probable cause existed that led him to believe a traffic violation had occurred. At the suppression hearing, Officer Picau testified that he had stopped Trejo on suspicion that Trejo could be fatigued or intoxicated, given that Trejo would not yield the left lane of travel to Picau. Picau testified that, while drivers are expected to obey traffic signs, such as those on multi-lane highways that direct slow-moving traffic to drive in the right lane, he admitted that he did not stop Trejo based on his failure to obey such a traffic sign. At no time was Trejo driving erratically, over the maximum speed limit, or under the minimum speed limit, and the record includes no evidence of any imminent threat of danger.
¶ 28. I add that it is not difficult to think of circumstances under which a peace officer may be justified in stopping and charging a motorist for prolonged presence in a far left, or inside, lane of a street or highway of four or more lanes. Mississippi Code Section 63-3-603(d) (Rev. 2004) reads, in pertinent part, as follows:
Whenever any roadway has been divided into three (3) or more clearly marked lanes for traffic ...
Upon all roadways any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into a private road or driveway.
Although we do not find in the present case a clear violation of Mississippi Code Section 63-3-603(d), today’s decision should not be read to diminish the validity or importance of that statute, which, if violated, should be enforced. This statute plainly establishes that the far-inside lane is intended mainly for passing. In this case, even if Trejo had violated Section 63-3-603(d), the arresting officer articulated no awareness of this statute’s existence, and, in any event, did not rely on it as justification for stopping the Trejo vehicle. If he had, this case might have been decided differently. Such a stop would have required this Court to interpret Section 63-3-603(d) in light of the facts presented.
¶ 29. Accordingly, there exists no reasonable basis to justify the officer’s stop of the Trejo vehicle, and thus, no probable cause. I agree with the plurality’s decision to reverse and render the conviction and sentence for possession of a controlled substance with intent to distribute; however, I cannot join in its adoption of the community caretaking function as it applies to traffic stops by police.
DICKINSON, P.J., JOINS THIS OPINION.

. Justice Randolph asks: "Can it fairly be argued that a police officer may not stop a delivery truck with an unsecured cargo door in the interest of public safety? A vehicle with an under-inflated tire? An RV with an unlatched hatch cover flapping in the breeze?” Since all of these illustrations unquestionably present threats of imminent danger, I am grateful to my esteemed colleague for providing additional support for my position.