IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 10, 2002 Session

## STATE OF TENNESSEE v. DENNIS R. JENKINS

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-51518     James K. Clayton, Jr., Judge**

———————————

**No. M2002-01702-CCA-R3-CD - Filed June 30, 2003**

———————————

The appellant, Dennis R. Jenkins, pled guilty in the Rutherford County Circuit Court to possession of methamphetamine, a Schedule II controlled substance, with intent to deliver. The trial court sentenced the appellant to three years to be served on probation and imposed a two thousand dollar ($2,000) fine. Pursuant to the plea agreement, the appellant reserved the right to appeal as a certified question of law the trial court's denial of his motion to suppress. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Kenneth Dale Quillen, Nashville, Tennessee, for the appellant, Dennis R. Jenkins.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Paul A. Holcombe, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Factual Background

At the suppression hearing, Lieutenant Chris Haynes of the Rutherford County Sheriff's Department testified that on March 1, 2001, he was assigned to the "Interstate Crime Enforcement Unit." As a member of this unit, Lieutenant Haynes's duties included "stop[ping] vehicles for traffic violations . . . [and] look[ing] for secondary crimes in the motor vehicles." On this particular day, the Interstate Crime Enforcement Unit was "running radar" on Highway 96 because there had been two fatalities on that highway the previous weekend.

Lieutenant Haynes testified that shortly before noon he was traveling east on Highway 96 when he observed a pickup truck traveling in the opposite direction. Although it was a clear and sunny day, the driver, later identified as the appellant, was continuously flashing the truck's

headlights on and off. Lieutenant Haynes estimated that the appellant flashed the headlights between five and eight times before passing the officer. Lieutenant Haynes immediately turned his patrol car around and stopped the truck as it turned onto Lofton Road. Lieutenant Haynes approached the driver and "asked him if there was a problem with his headlights or what was going on." The appellant responded that there was no problem with the headlights and implied that he was warning oncoming traffic of the presence of police officers.

As he questioned the appellant, Lieutenant Haynes observed "two aluminum foil balls about the size of a golf ball" in plain view on the seat beside the appellant. Lieutenant Haynes testified that he could "clearly see there was burn residue on the aluminum foil balls." Lieutenant Haynes stated that in his ten years in law enforcement, "every time I have seen the aluminum foil balls with drug residue, there has been crystal methamphetamine present." After the appellant denied having anything illegal in the truck, Lieutenant Haynes asked to search the vehicle and the appellant consented to the search. However, before searching the truck, Lieutenant Haynes asked the appellant to empty his pockets. The appellant appeared to comply, partially emptying his pockets. At that time, Lieutenant Haynes observed no evidence of methamphetamine on the appellant's person.

Lieutenant Haynes next opened the aluminum foil balls and discovered traces of what he believed to be crystal methamphetamine. Thereafter, Lieutenant Haynes conducted a more thorough search of the appellant's person and found "a plastic baggy with a white, powdery substance" and a straw. Lieutenant Haynes then searched the truck and discovered a black leather satchel under the driver's seat. The satchel contained Xanax, twenty-one bags of crystal methamphetamine, and straws.[1] Lieutenant Haynes also discovered "an eight shot .22 pistol, and . . . some type of rifle." After finding these items, Lieutenant Haynes placed the appellant "in the back seat of my patrol car" and advised him of his rights.[2]

On cross-examination, Lieutenant Haynes conceded that when he first observed the appellant's truck, he did not know why the appellant was flashing the truck's headlights. Lieutenant Haynes testified that he believed the flashing of the headlights to be illegal under Tennessee Code Annotated section 55-9-402.[3] Moreover, Lieutenant Haynes stated that he was concerned that the

---

[1] Testing by the Tennessee Bureau of Investigation crime laboratory confirmed that the substances constituted Xanax and 4.1 grams methamphetamine.

[2] Throughout the record, Lieutenant Haynes's vehicle is referred to as his "patrol" car. In his appellate brief, the appellant notes that "Haynes immediately turned his cruiser around, got behind [the] defendant's truck, activated the flashing blue lights and stopped the defendant." There is no reference to an unmarked car.

[3] Tennessee Code Annotated section 55-9-402(a)(1) (1998) provides that "[n]o non-emergency vehicle shall operate or install emergency flashing light systems such as strobe, wig-wag, or other flashing lights within the headlight assembly or grill area of the vehicle." Moreover, subsection (d)(1) provides that

> [n]o vehicle operated in this state shall be equipped with any flashing red or white
> light or any combination of red or white lights which displays to the front of such

(continued...)

appellant needed help, was in medical duress, or was being held hostage. Lieutenant Haynes testified that he believed he would have been "derelict in [his] duties as a police officer not to stop [the appellant] and check his welfare."

Lieutenant Haynes stated that he stopped the truck by activating his flashing blue lights, but did not use a "siren warning." He explained that he did not ask to see the appellant's driver's license until he had inquired about the truck's flashing headlights. Lieutenant Haynes conceded that the appellant likely did not feel free to leave after being stopped and that he did not inform the appellant that he had the right to refuse the search. Lieutenant Haynes estimated that the stop lasted approximately ten minutes.

Following the testimony of Lieutenant Haynes, the trial court viewed a video recording of the traffic stop. The videotape revealed that the stop lasted nine minutes.[4] The appellant also testified at the suppression hearing. According to the appellant, when Lieutenant Haynes asked to search his truck, he told Lieutenant Haynes to "[d]o whatever you have got to do." He admitted that he did not refuse to consent or attempt to revoke his consent to the search.

Based upon the foregoing, the trial court denied the appellant's motion to suppress. The trial court found that

> Lieutenant Haynes stopped because of the blinking of the lights and to checkout – to see if [the appellant] had a problem. Unfortunately for [the appellant], he had the two rolled up balls of aluminum foil sitting beside him on the seat, which Lieutenant Haynes who had been trained in drug [i]ntradiction observed. And at that point I think it was a proper stop.

Upon the trial court's denial of his motion to suppress, the appellant pled guilty to possession of methamphetamine with intent to deliver. The trial court sentenced the appellant to three years to be served on probation and imposed a two thousand dollar ($2,000) fine. Pursuant to the plea agreement, the appellant reserved the right to appeal as a certified question of law the trial court's denial of his motion to suppress. See Tenn. R. Crim. P. 37(b)(2)(i). On appeal, the appellant asserts that the State "failed to show by a preponderance of [the] evidence specific and articulable facts giving rise to reasonable suspicion to stop the [appellant's] vehicle."

## II. Analysis

[3] (...continued)
> vehicle except school buses, a passenger motor vehicle operated by a rural mail carrier . . . , authorized law enforcement vehicles only when used in combination with a flashing blue light, and emergency vehicles used in firefighting.

Violation of this statute is a Class C misdemeanor. Tenn. Code Ann. § 55-9-402(e).

[4] Although introduced into evidence at the suppression hearing, the videotape was not included in the record on appeal. This court issued an order to supplement the record with the videotape of the stop.

The trial court's findings of fact in a suppression hearing will be upheld on appeal unless the evidence preponderates against those findings. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

Id. However, the application of the law to the trial court's findings of fact is a question of law subject to de novo review. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and Article 1, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures by law enforcement officers. The purpose of the Fourth Amendment and Article 1, section 7 is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001) (quoting State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997)); see also State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997). Under both constitutions, "'a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (quoting Yeargan, 958 S.W.2d at 629); see also Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971).

The United States Supreme Court announced one such exception to the warrant requirement in Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968), holding that a law enforcement officer may conduct a brief investigatory stop of an individual if the officer has a reasonable suspicion based upon specific and articulable facts that a criminal offense has been, is being, or is about to be committed. See also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). This standard also applies to the investigatory stop of a vehicle. Delaware v. Prouse, 440 U.S. 648, 663, 99 S. Ct. 1391, 1401 (1979); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). In other words, a law enforcement officer may stop a vehicle if the officer possesses a reasonable suspicion supported by specific and articulable facts that an offense has been, is being, or is about to be committed. Watkins, 827 S.W.2d at 294.

The Supreme Court has observed that "[a]rticulating precisely what 'reasonable suspicion' . . . mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695, 116 S. Ct. 1657, 1661 (1996); see also State v. Smith, 21 S.W.3d 251, 256 (Tenn. Crim. App. 1999). Reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Ornelas, 517 U.S. at 695, 116 S. Ct. at 1661 (quoting Illinois v. Gates, 462 U.S. 213, 231, 103 S. Ct. 2317, 2328 (1983)).

"Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of criminal activity." Binette, 33 S.W.3d at 218 (citing Ornelas, 517 U.S. at 696, 116 S. Ct. at 1661). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norwood, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8, 109 S. Ct. 1581, 1585 (1989); Watkins, 827 S.W.2d at 294. These circumstances include, but are not limited to, "[the officer's] objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Watkins, 827 S.W.2d at 294 (citations omitted).

In the instant case, the seizure of the appellant's truck was based on Lieutenant Haynes's observations and the conclusions drawn from those observations. On the day of the offense, Lieutenant Haynes was traveling east on Highway 96 when he observed the appellant's pickup truck approaching from the opposite direction with its headlights flashing. The headlights continued to flash as the truck passed the officer's patrol car. Lieutenant Haynes testified that he believed the flashing of the headlights to be illegal. Moreover, Lieutenant Haynes explained,

> At the time that [the appellant] was flashing his headlights at me, I didn't know . . . if he needed help, he was in medical duress, or what the problem was. I feel like had I not turned around and checked on [the appellant,] had he been in medical duress or had he been held hostage or something -- or anything, then I would be derelict in my duties as a police officer not to stop him and check his welfare.

Considering the totality of these circumstances, we conclude that the stop was constitutionally valid.

Additionally, in Mincey v. Arizona, 437 U.S. 385, 392, 98 S. Ct. 2408 (1978) (quoting Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963)), the Supreme Court stated, "We do not question the right of the police to respond to emergency situations. . . . 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" Correspondingly, in Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973), the Court observed that

> [b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking

functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Based upon the rationale of Cady, a number of states have acknowledged that in certain cases officers exercising their "community caretaking function" may be justified in making stops in the absence of probable cause or reasonable suspicion of criminal activity. See United States v. Rideau, 949 F.2d 718, 720 (5th Cir. 1991); United State v. Smith, 162 F.3d 1226, 1226 (8th Cir. 1998); State v. Vistuba, 840 P.2d 511, 514 (Kan. 1992); State v. Lovegren, 51 P.3d 471, 475-76 (Mont. 2002); State v. Norman, 735 N.E.2d 953, 958 (Ohio Ct. App. 1999); State v. Marcello, 599 A.2d 357, 358 (Vt. 1991); State v. Kinzy, 5 P.3d 668, 675-76 (Wash. 2000); Lancaster v. State, 43 P.3d 80,105 (Wyo. 2002). The United States Court of Appeals for the Tenth Circuit noted in United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993), that "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" Moreover, in State v. Pinkham, 565 A.2d 318, 319 (Me. 1989), the Supreme Judicial Court of Maine stated that "[i]f we were to insist upon suspicion of activity amounting to a criminal or civil infraction to meet the Terry . . . standard, we would be overlooking the police officer's legitimate role as a public servant to assist those in distress and to maintain and foster public safety." Id. at 319. Thus, the court held that safety reasons alone would be sufficient to conduct an investigatory stop if the reasons were based upon specific and articulable facts. Id. We find the reasoning of these courts to be sound.

As previously noted, Lieutenant Haynes testified that, on a bright and sunny March afternoon, he was "running radar" when he observed an oncoming vehicle flashing its headlights. Lieutenant Haynes testified that he was concerned about the driver, stating, "I feel like had I not turned around and checked on [the appellant,] had he been in medical duress or had he been held hostage or something -- or anything, then I would be derelict in my duties as a police officer not to stop him and check his welfare." We conclude that Lieutenant Haynes's concern was based upon specific and articulable facts, thereby justifying the stop.

### III. Conclusion

Accordingly, we affirm the judgment of the trial court.

_____

NORMA McGEE OGLE, JUDGE

-6-