TORPY, J.,
concurring and concurring specially.
In my view, this case should not be analyzed using many of the Fourth Amendment concepts identified by my colleagues in their opinions because these concepts pertain only to searches for evidence of crime. The purpose for a search warrant is to ensure that “conclusions as to probable cause will be drawn by a neutral magistrate unrelated to the criminal investigative-enforcement process.” South Dakota v. Opperman, 428 U.S. 364, 371 n. 5, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). “Probable cause” is a concept that is confined to criminal investigations. Id. When a warrant would not serve this prophylactic purpose, it is inapplicable. Id. Indeed, a search warrant is not available unless police are searching for criminals, evidence of crimes, instruments of crimes, fruits of crimes or contraband. § 933.14, Fla. Stat. (2007), see also Fed.R.Crim.P. 41(c) (warrant may issue for evidence, fruits or instruments of crime, contraband or persons to be arrested for crime). Here, the decision to search was not to discover evidence of a crime at all. Thus, the presumption of unreasonableness associated with warrant-less searches, acknowledged by the majority and argued by Judge Orfinger, is not applicable, because this is not a case where a warrant would have been applicable or even available. It makes no sense that there should exist a presumption of unreasonableness because police did not procure that which is inapplicable and unattainable.
The phrase “exigent circumstances,” likewise pertains to searches in criminal investigations. It is said to be an “exception to the warrant requirement,” predicated on the impracticability of first obtaining a warrant. G.M. Leasing Corp. v. United States, 429 U.S. 338, 339, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (emphasis added). The existence of such exigent circumstances does not obviate the need for “probable cause” to search, however. It only excuses the step of first obtaining judicial authority to conduct the search. Anderson v. Creighton, 483 U.S. 635, 657, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, although courts sometimes employ this rhetoric in the context of searches in noncriminal cases, it is a jurisprudential concept that simply does not fit in cases such as this one. Whether an “exigency” existed, so as to excuse the precaution of prior independent review of “probable cause” and the issuance of a warrant to search for criminals or evidence, is not the issue.
There may be many occasions where noncriminal searches are precipitated by “exigent circumstances,” but the finding that a true exigency exists should not be a requisite finding to the conclusion that a search of this nature meets the reasonableness standard of the Fourth Amendment. This seems to be a central point of departure between the majority and dissenting opinions. All seem to agree that the police acted reasonably, but the majority concludes that an exigency existed, while the dissenting judges do not. Although I agree with the conclusion of the majority on this issue, I admit that the point is fairly debatable, depending on how one defines and views “exigent circumstances.” *605 See Payton v. New York, 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (equating “exigent circumstances” with “emergency”)- I think the debate is unnecessary, however, because the relevant inquiry simply should be whether the police acted reasonably under the circumstances, which is the “ultimate standard” under the Fourth Amendment. Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).[3]
On this issue, at our level of review, we must afford deference to the inferences drawn by the police and the trial judge. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In other words, when multiple reasonable inferences may be drawn from the same set of circumstances, it is not our function to determine which inference is most probable or most reasonable. Instead, we must determine, after all inferences are considered from the vantage point of a reasonable police officer, whether this officer acted reasonably under these circumstances. Id.
Here, there is no contention that the police officer acted in bad faith or with an ulterior motive. The goal of attempting to reunite this young child with his parents was legitimate and one that we as a society should foster. At each juncture, the officer learned additional information that justifiably led him to conclude that something was amiss. By the time the officer entered the house, the parents were seriously overdue in picking up the young child at a late hour. It is not likely that a parent would forget to pick up a child of this age at this time of day, for this period of time. And, in this day where everyone has access to a cellular phone, one would expect at least a phone call from a tardy parent if the parent was merely unavoidably detained. One could deduce from these facts alone that something was wrong.
The fact that the boy believed his parents were home is also significant. Although he had not been home all day, he could no doubt make a reasonable prediction that his parents were home, just as any family member could predict the location of loved ones based upon the time of day, knowledge of their habits and other circumstances. When neither parent answered the door, although other reasonable inferences might have been drawn, it was not unreasonable to conclude that the parents were in danger. This conclusion was buttressed by the fact that the door to the bedroom was locked from the inside, justifying the further intrusion into the inner sanctum of the home.
Even if the officer was not reasonable in his belief that the parents were in danger, he was still duty-bound to protect the child. That duty justified taking the child to the home and, when unable to get the parents to come to the door, further justified the entry into the home to see if the parents were in fact there. The officer’s only other options were to leave the child at the home without verifying that a parent was home or to place the child with the Department of Children and Families. These options would have left him in a potentially “no-win” situation. Had he believed the child when he said his parents were home and simply left him in the residence without further investigation, the risk was that a six-year-old child might be left alone with no supervision. Had the officer turned the child over to the Depart *606 ment of Children and Families, he would run the risk of unnecessarily subjecting him to the emotional trauma of being left in an unfamiliar place with total strangers, should it later turn out that his parents were in fact home, but simply did not hear the knock at the door. If the boy suffered harm in either hypothetical circumstance, the police would surely be criticized and maybe even sued.[4]
The choice that the officer made — to confirm whether a parent was home by entering the premises — was the most reasonable choice under the circumstances, when viewed from the perspective of a reasonable officer. Even if it was not the most reasonable choice, however, it was not an unreasonable one. The importance of the goal of reuniting this young child with his parents in an expeditious and informal way cannot be overstated. The alternative of turning the child over to another governmental agency, with the concomitant reports, procedures, investigations and disruption to both the child and parents, would probably be considerably more intrusive than the brief entry into the home. It was reasonable for the officer to assume that most parents, innocent of wrongdoing, would prefer this minimal intrusion into their privacy over the hardship, disruption and intrusion to their family of having the child placed in the official custody of the government. See Florida v. Bostick, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (“reasonable person” test presupposes an innocent person).
Whether the so-called “community caretaker doctrine” applies in this case is not critical to my conclusion. In my view, reasonableness is the ending point of any Fourth Amendment analysis. When a search is criminal in purpose, a finding of reasonableness involves a determination of whether probable cause existed and, if the search was warrantless, whether judicially developed warrant exceptions apply. When a search is noncriminal in purpose, however, criminal concepts are not helpful in making the determination of reasonableness.
I nevertheless disagree with the views of my dissenting colleagues who would disapprove of the application of the community caretaker doctrine in the context of a residential search. I acknowledge that the Court in Cady discussed the distinction between vehicles and residences. That is because there were two issues in Cady— the first of which was whether the search was unreasonable “solely because the ... officer had not previously obtained a warrant.” 413 U.S. at 442, 93 S.Ct. 2523. This issue involved the application of the “automobile exception,” which was originally predicated on the impracticability of obtaining a warrant due to the inherent mobility of an automobile. Arguably, in Cady, the exception was not applicable because Cady’s car had already been impounded before the search was conducted. Concluding that mobility was not the sole justification for warrantless searches of automobiles, and drawing a distinction between dwellings and vehicles insofar as privacy expectations are concerned, the Court answered the first question in the negative. Id. at 446, 93 S.Ct. 2523.
The second issue in Cady was whether the search was otherwise unreasonable under the Fourth and Fourteenth Amendments because it was conducted without probable cause. Id. The sole purpose for the search in Cady was to take custody of a firearm for the protection of the public *607 against the possibility that the gun would fall into the wrong hands. There was no contention that the firearm was evidence, fruits or instruments of a crime or that it was contraband. Thus, the question was whether police may search without probable cause for the sole purpose of fulfilling their “caretaking” function. The Court’s discussion of the distinction between vehicles and residences was not relevant to its holding on this issue. It simply held that, in searches of this type, unless police act “unreasonably,” the search will withstand Fourth Amendment scrutiny. Id. at 448, 93 S.Ct. 2523. Indeed, Cady does not compel, and there is no logical basis for, a distinction between vehicles and residences for purposes of assessing whether police acted reasonably in conducting a noncriminal search under their caretaking function. In our complex society, police are charged with the duty to protect people and property, wherever they are situated, under a variety of circumstances.[5] Surely, the caretaking function of police may appropriately involve intrusions into both conveyances and structures, whether or not a true emergency exists.[6]
One situation where the police perform the earetaking function involving the possible intrusion into residences is the so-called “well-being checks.” In Wallace v. Dean, 3 So.3d 1035 (Fla.2009), for example, deputies were called upon to check on a mother whose out-of-state daughter had become concerned because she had been unable to reach her mother by telephone throughout the day. Deputies responded and decided to enter the house through an unlocked window. Id. at 1043. Once inside, they discovered the woman in an unconscious state. Id. Although there was no Fourth Amendment issue in that civil case, it illustrates a scenario where police, under the caretaking function, assume a duty to investigate and enter a residence even when they might not have enough information to have “probable cause” that an “emergency” exists.
Well-being checks, such as the one in Wallace, involving warrantless entry into a private residence, present Fourth Amendment questions similar to those presented here: Does the community “caretaking doctrine” apply to an intrusion of this nature? If not, are the police authorized to enter residential premises when they have only a suspicion that someone might be in distress, or do they need “probable cause?” When the police are in doubt about their authority, should they resolve that doubt by pursuing the course of action that places a higher priority on the well-being of persons than on individual privacy? To me, the answers are obvious. Provided *608 that the police proceed in good faith, limit the intrusion to that which is minimally necessary to fulfill the purpose for the intrusion, and otherwise act reasonably, the letter and spirit of the Fourth Amendment are fulfilled, and any evidence or contraband discovered in plain view during such an intrusion should not be excluded.
In any event, this is clearly not a case where the application of the exclusionary rule is appropriate. The purpose of the exclusionary rule is to deter police misconduct. United States v. Leon, 468 U.S. 897, 918, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The motives of the police officer in this case were genuine and he acted within the scope of his duties as a caretaker of the public. I fail to see how the application of the exclusionary rule in this case would serve to deter police and preserve the protections of the Fourth Amendment. Id. (exclusionary rule applicable “only in those unusual cases in which exclusion will further the purposes of the exclusionary rule”). See Herring v. United States, — U.S. -, 129 S.Ct. 695, 702, 172 L.Ed.2d 496 (2009) (“To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it.... [E]xclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence”).
LAWSON, J., concurs.

. This interpretation is grounded in the text of the Fourth Amendment itself. The first clause of the Fourth Amendment contains a general prohibition against unreasonable searches. The second clause pertains only to the requirements for warrants for searches in criminal cases. See Amend. IV, U.S. Const.

. See Wallace v. Dean, 3 So.3d 1035, 1052 (Fla.2009) (imposing liability on law enforcement officers under undertaker’s doctrine).

. Police officers wear many hats: criminal investigator, first aid provider, social worker, crisis intervener, family counselor, youth mentor and peacemaker, to name a few. They are charged with the duty to protect people, not just from criminals, but also from accidents, natural perils and even self-inflicted injuries. We ask them to protect our property from all types of losses — even those occasioned by our own negligence. They counsel our youth. They quell disputes between husband and wife, parent and child, landlord and tenant, merchant and patron and quarreling neighbors. Although they search for clues to solve crime, they also search for missing children, parents, dementia patients, and occasionally even an escaped zoo animal. They are society’s problem solvers when no other solution is apparent or available.

. For example, when the police become . aware that the door to a business is unlocked at a late hour, even in the absence of evidence of forced entry or other emergency, it is reasonable for them to enter the business to check for intruders, verify that the property is otherwise secure and locate contact information for the owner, as part of their caretaking function. Intrusions of this nature may also be justified because of the implicit relinquishment of privacy expectations by the owner.