Argued and submitted October 26, 2009, reversed and remanded July 28, respondent's petition for reconsideration filed September 8 and appellant's response to petition for reconsideration filed September 14 allowed by opinion November 10, 2010
See 238 Or App 541, 243 P3d 116 (2010)

## STATE OF OREGON, ·
### *Plaintiff-Respondent,*

*v.*

## RICHARD CHAVES GONZALES,
### *Defendant-Appellant.*

### Washington County Circuit Court
### C072951CR; A138187

236 P3d 834

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Harry B. Wilson, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R, Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Rosenblum, Presiding Judge, and Brewer, Chief Judge, and Deits, Senior Judge.

ROSENBLUM, P. J.

## ROSENBLUM, P. J.

Defendant appeals a judgment of conviction for possession of a controlled substance. In November 2007, Officer Blood of the Cornelius Police Department saw defendant commit a traffic violation and activated the overhead lights on his patrol car, signaling defendant to stop. Defendant continued to drive for two or three blocks and then pulled into his own driveway and stopped. He informed Blood that his driver's license was suspended and gave him an expired insurance card. ORS 809.720 and Cornelius City Code section 10.40.030 both provide that a police officer may impound a vehicle if the driver was driving while suspended or without insurance. Blood decided to impound the car that defendant was driving and, in preparation for having it towed, conducted an inventory. He found defendant's wallet under one of the seats and, in the wallet, a small plastic bag containing cocaine. Defendant moved to suppress the evidence resulting from the inventory, arguing that Blood did not have authority to impound the vehicle and that the inventory was therefore unlawful. The trial court denied the motion and subsequently convicted defendant. We reverse and remand.

At the suppression hearing, Blood testified that defendant's conduct prior to stopping the vehicle did not amount to "elud[ing],"[1] but would be more properly characterized as a failure to yield. He testified about the reasons that people commonly fail to yield after being signaled to stop:

> "Oftentimes, I get slow responses from people who are intoxicated. And other times, I get a slow response from people who may be suspended or not have insurance, because they want to get to what I call home base. They think their car won't get impounded if they get caught."

Blood went on to describe his contact with defendant:

> "I asked him for his license and insurance. He told me he did not have a license. I asked him if he was suspended.

---

[1] ORS 811.540 provides that a person commits a Class C felony if the person knowingly flees or attempts to elude a pursuing police officer in a vehicle after the officer has signaled the person to stop.

He told me yes. When I asked him what for, he told me he let his license expire."

Blood added that he checked defendant's license status through dispatch and was advised that his license was suspended. He testified further that he did not cite defendant for the initial traffic violation but did cite him for "[d]riving suspended violation and driving uninsured."[2] The prosecutor then asked Blood what he did next:

"Q   * * * Well, what did you do then?

"A   I issued [defendant] citations and conducted an inventory of the vehicle.

"Q   Why did you do that?

"A   It's our policy, practice, to inventory vehicles prior to them being impounded by a private tow company.

"Q   And why was the car being impounded by a private tow company?

"A   Because [defendant] was violation suspended and he was driving uninsured."

On cross-examination, defendant's counsel asked Blood whether the impounded car was registered in defendant's name. Blood said that he could not recall. Counsel asked, "Isn't it true that it was actually in his mother-in-law's name?" Blood answered, "I couldn't tell you."

After Blood testified, the state introduced into evidence a copy of defendant's driving record, which defendant stipulated to be accurate. The record shows that defendant's license was suspended in 1999 for driving uninsured and that he was convicted in 2001 of driving while suspended and in 2005 of both driving while suspended and driving uninsured.

Defendant's wife, Regina Gonzales, also testified at the hearing. She testified that the car defendant had driven belonged to her mother and that her mother had insurance on the car. Gonzales also testified that she did not have a

_____

[2] ORS 811.175 provides that driving while suspended is a Class A traffic violation unless it is committed under circumstances, listed in ORS 811.182, that elevate the offense to a misdemeanor or a felony. Blood cited defendant for a traffic violation only.

driver's license but that her mother did. She stated that her mother was not at the house when defendant was stopped. She added that her mother had, on and off for several months, left the car at their house because she had two vehicles but had only one parking space at her own home, which was three or four miles away.

The prosecutor argued to the trial court that Blood validly impounded the car under the community caretaking doctrine. She pointed out that defendant's license had been suspended for having no insurance, that he had previously been convicted of driving while suspended and driving uninsured, and that there were no other insured drivers at the scene. She argued that, as a public policy matter, "[w]e don't want people driving around when they have a car easily at their disposal when they don't have insurance on that car and * * * they have a suspended license * * *." She contended that impounding the car would prevent further unlicensed and uninsured driving. The prosecutor also argued that allowing a person to avoid having the car impounded by making it to his or her driveway when the police are in pursuit with their overhead lights on would encourage unlicensed and uninsured drivers to elude the police and to drive recklessly.

Defendant argued to the trial court that, because he had stopped in his own driveway, Blood lacked authority to impound the car. He contended that the community caretaking doctrine allows impoundment only when a car is blocking traffic or would be left in a public location because no licensed driver is available to remove it. Defendant relied on *Miranda v. City of Cornelius*, 429 F3d 858 (9th Cir 2005), in which the Ninth Circuit held, under similar circumstances, that the community caretaking doctrine did not justify impounding a car.

The trial court asked whether the issues defendant was raising would apply if defendant had pulled over as soon as Blood signaled him to stop instead of continuing on to his driveway. Defendant conceded that they would not. The court concluded that defendant had failed to pull over within a reasonable time, and it stated, "I'm not going to allow the defendant to benefit from that failure * * *." Accordingly, it

denied defendant's motion to suppress. After a stipulated facts trial, the court found defendant guilty.

■        On appeal, the parties' arguments again primarily center on whether impoundment of a vehicle for deterrent purposes falls within the community caretaking exception to the Fourth Amendment's warrant requirement.[3] In addition, the state raises two other arguments. First, it notes that the federal exclusionary rule applies only when suppressing evidence would deter the police from future constitutional violations. According to the state, Blood impounded the car in good faith reliance on ORS 809.720 and the Cornelius City Code provisions that authorize impoundment, so the exclusionary rule does not apply here. Second, the state argues that defendant had no possessory interest in the car and thus is not entitled to contest the impoundment or to benefit from the exclusionary rule.[4]

■        The state's alternative arguments require little discussion, so we dispose of them at the outset. The state did not raise either argument at trial, and neither argument served as the basis for the trial court's ruling. If the question presented is not purely one of law, we will affirm a trial court on an alternative ground only if, among other requirements, "the record materially [is] the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). Both of the state's alternative arguments present factual issues. The first turns on whether Blood acted in good faith in

---

[3] Defendant does not contend that the impoundment violated the Oregon Constitution. Accordingly, we address only the federal constitutional issues that the parties' arguments raise.

[4] The state also argues that, by impounding the car, Blood ensured that it would be returned to its rightful owner. That argument is not well taken. We assess the reasonableness of a seizure based on the information that the police had at the time of the seizure. *Scott v. United States*, 436 US 128, 137, 98 S Ct 1717, 56 L Ed 2d 168 (1978) ("[A]lmost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him."). Nothing in the record indicates that Blood was aware that the car did not belong to defendant and that its actual owner was not present when he impounded it. We express no opinion as to whether the impoundment would have been reasonable had Blood been aware of those facts.

impounding the car, and the second turns on whether defendant had a possessory interest in the car. Had those issues been raised in the trial court, defendant might have been able to develop a different record by presenting evidence concerning Blood's knowledge and understanding of the Ninth Circuit's decision in *Miranda*—which we explain below—and evidence as to defendant's possessory interest in the car. Because the record might have developed differently, we do not consider the state's alternative arguments.

■ We turn, then, to the parties' arguments concerning the community caretaking exception. Our analysis starts from the unassailable premises that the impoundment of the car in this case was a seizure within the meaning of the Fourth Amendment and that the car was not seized pursuant to a warrant. The state concedes that, if the impoundment was not a valid exercise of the police's community caretaking function, the seizure violated the Fourth Amendment.

The United States Supreme Court first noted the community caretaking function of the police in explaining the automobile exception to the warrant requirement. In *Cady v. Dombrowski*, 413 US 433, 441, 442, 93 S Ct 2523, 37 L Ed 2d 706 (1973), the Court stated that the police may search automobiles, unlike buildings, based on probable cause alone, because of the "ambulatory character" of automobiles and the fact that

> "the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers * * * frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."

At issue in *Cady* was the lawfulness of a search of a car driven by the defendant, a Chicago police officer, which led to evidence implicating the defendant in a murder. The defendant had crashed the car in rural Wisconsin and was

taken to the hospital. *Id.* at 435-36. The police had the car towed to a privately owned garage. The Wisconsin police believed that Chicago police officers were required to carry their service revolvers at all times, and they had not found a revolver on the defendant's person, so they searched the car, including the trunk, pursuant to " 'standard procedure in [that police] department,' to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443 (brackets in *Cady*). Items found in the trunk implicated the defendant in a murder and were used against him at trial. *Id.* at 438.

The Supreme Court ruled that both the impoundment of the car and the search of the trunk were reasonable. With respect to the impoundment, the Court did not expressly refer to the community caretaking function, but it noted that the car

> "was disabled as a result of the accident, and constituted a nuisance along the highway. [The defendant], being intoxicated (and later comatose), could not make arrangements to have the vehicle towed and stored. At the direction of the police, and for elemental reasons of safety, the automobile was towed to a private garage."

*Id.* at 443. It went on to observe that the car

> "was not parked adjacent to the dwelling place of the owner as in *Coolidge v. New Hampshire*, 403 US 443, 91 S Ct 2022, 29 L Ed 2d 564 (1971),[5] nor simply momentarily unoccupied on a street. Rather, like an obviously abandoned vehicle, it represented a nuisance, and there is no suggestion in the record that the officers' action in exercising control over it by having it towed away was unwarranted either in terms of state law or sound police procedure."

*Id.* at 446-47.

With respect to the search of the trunk, the Court did expressly refer to the "caretaking" nature of the police's conduct:

---

[5] *Coolidge* did not address the community caretaking doctrine. Rather, the Court considered whether the seizure of the defendant's car from his driveway and the subsequent search of it were justified by the automobile exception to the warrant requirement. 403 US at 458 (plurality opinion).

"The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking 'search' conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained. * * * Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendments."

*Id.* at 447-48.

The Supreme Court cited *Cady* and the "community caretaking function" of the police in analyzing a warrantless impoundment and inventory of a car in *South Dakota v. Opperman*, 428 US 364, 96 S Ct 3092, 49 L Ed 2d 1000 (1976). In that case, the defendant's car was impounded for parking violations. *Id.* at 366. An officer inventoried the contents of the car at the impound lot and found drugs. The defendant moved to suppress the evidence, arguing that it was obtained in violation of the Fourth Amendment.

The Supreme Court reviewed the justification for the automobile exception to the warrant requirement, again noting "the element of mobility" as well as the fact that, "[i]n discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles," most of which, the Court noted, is "distinctly noncriminal in nature." *Id.* at 367-68. The Court explained:

"In the interests of public safety and as part of what the Court has called 'community caretaking functions,' *Cady v. Dombrowski, supra*, at 441, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The

authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."

*Id.* at 368-69 (footnote omitted). The Court also described the "practice of securing and inventorying the automobiles' contents" as "caretaking procedures," explaining that the practice "developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* at 369 (citations omitted). The Court concluded that the police conduct was reasonable and that the evidence was validly seized.

Since deciding *Opperman,* the Supreme Court has not elaborated on the community caretaking doctrine with respect to impounding vehicles except to hold, in *Colorado v. Bertine,* 479 US 367, 373-74, 107 S Ct 738, 93 L Ed 2d 739 (1987), that impoundment is reasonable even though less intrusive alternatives might be available. However, as noted above, the Ninth Circuit addressed the doctrine in *Miranda,* which involved facts similar to those in this case, albeit in a different procedural posture.

*Miranda* was a civil action brought under 42 USC section 1983, in which the plaintiffs, who were husband and wife, alleged that their Fourth Amendment rights were violated when the police impounded their van. 459 F3d at 861. The husband, who was a licensed driver, was teaching the wife, who was not licensed, to drive in their neighborhood. A police officer observed the wife driving the van poorly and at a low speed. He activated his overhead lights and followed the van until the wife pulled into the driveway of the plaintiffs' home. The officer cited the wife for driving without a license and cited the husband for permitting the operation of a vehicle by an unlicensed driver. He then impounded the van and had it towed away pursuant to the same City of Cornelius ordinance and statute at issue in this case.

The Ninth Circuit concluded that the impoundment was not a reasonable exercise of the police's community caretaking function:

"In their 'community caretaking' function, police officers may impound vehicles that 'jeopardize public safety and the efficient movement of vehicular traffic.' *Opperman*, 428 US at 368-69. Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft. A driver's arrest, or citation for a non-criminal traffic violation as in this case, is not relevant except insofar as it affects the driver's ability to remove the vehicle from a location at which it jeopardizes the public safety or is at risk of loss. But no such public safety concern is implicated by the facts of this case involving a vehicle parked in the driveway of an owner who has a valid license.

"* * * * *

"An impoundment may be proper under the community caretaking doctrine if the driver's violation of a vehicle regulation prevents the driver from lawfully operating the vehicle, and also if it is necessary to remove the vehicle from an exposed or public location. The violation of a traffic regulation justifies impoundment of a vehicle if the driver is unable to remove the vehicle from a public location without continuing its illegal operation.

"* * * * *

"The state has the right to allow the driver to drive away with the vehicle only if he or she is able to do so in compliance with all regulations intended to ensure the vehicle's safe operation. However, the decision to impound a vehicle after the driver has violated a vehicle regulation must consider the location of the vehicle, and whether the vehicle was actually 'impeding traffic or threatening public safety and convenience' on the streets, such that impoundment was warranted."

*Id.* at 864-65 (citations and footnote omitted).

The defendants in *Miranda* argued that the impoundment satisfied the caretaking function by deterring the plaintiffs from repeating their illegal activity in the future. *Id.* at 866. The court rejected that argument, stating that "[s]uch a rationale would expand the authority of the police to impound regardless of the violation, instead of limiting officers' discretion to ensure that they act consistently

with their role of 'caretaker of the streets.'" *Id.* The court concluded that "the deterrence rationale is incompatible with the principles of the community caretaking doctrine." *Id.*

Defendant in this case relies heavily on *Miranda*, essentially urging us to adopt the Ninth Circuit's reasoning. The state responds that *Miranda* presents an overly narrow interpretation of the community caretaking doctrine. It notes that, in *Opperman*, the Supreme Court referred to "the interests of public safety" in describing community caretaking. 428 US at 368. According to the state, deterring unlicensed drivers from using the roads furthers the interests of public safety and thus comes within the community caretaking doctrine. It notes that the Supreme Court has recognized that states have a "vital interest" in ensuring that only qualified drivers are permitted to operate motor vehicles. *See Delaware v. Prouse*, 440 US 648, 658, 99 S Ct 1391, 59 L Ed 2d 660 (1979). The state also contends that "deterrent seizures" protect the public by preventing illegal behavior.

■ ■ We agree with the Ninth Circuit's reasoning in *Miranda* and need not restate it at length here. The community caretaking doctrine does not encompass *all* police activity that furthers the interests of public safety, as the state appears to assert. Seizures by the police aimed at protecting the public by preventing illegal behavior are not sufficiently "divorced from the detection, investigation, or acquisition of evidence" to be shielded from the Fourth Amendment's warrant requirement. *See Cady*, 413 US at 441. To the extent that deterring unlicensed drivers from using the roads can be viewed as a public safety matter independent of law enforcement, we reject the state's suggestion that leaving the car accessible to defendant would have created a threat to public safety. That contention amounts to little more than speculation that defendant would have driven the car again and would not have been deterred by the citation for driving while suspended, which carried a fine of up to $720.[6] *See* ORS 153.018(2)(a); ORS 811.175(4).

---

[6] The state contends that defendant's driving record reflects a history of driving while suspended in spite of citations for doing so and thus demonstrates the need for a more powerful deterrent. The problem with the state's argument is, again, that we assess the reasonableness of a seizure based on the information that the police had at the time of the seizure. *Scott*, 436 US at 137. Nothing in the record indicates that Blood was aware of defendant's driving record when he impounded

In short, under the circumstances of this case, community caretaking does not extend to impounding a car from the defendant's driveway. It follows that the warrantless seizure of the car was unlawful and that the evidence discovered in the subsequent inventory should have been suppressed.

Reversed and remanded.

---

the car. We express no opinion as to whether the impoundment would have been reasonable had Blood been aware of defendant's record.