NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230419-U

NO. 4-23-0419

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 6, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Knox County |
| BRANDIE M. ROBERTS, | ) | No. 22CF419 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Andrew J. Doyle, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1      *Held*:   The trial court erred in denying defendant's motion to suppress evidence where the record failed to show the challenged inventory search was conducted pursuant to standardized police procedures and the manner in which the search was conducted suggested an investigatory motive.

¶ 2      Following a bench trial, defendant, Brandie M. Roberts, was convicted of unlawful possession of methamphetamine (720 ILCS 646/60(a), (b)(1) (West 2022)) and sentenced to one year of probation. She appeals, arguing (1) the trial court improperly denied her motion to suppress the drug evidence against her and (2) the State failed to prove her guilt beyond a reasonable doubt. We reverse the court's denial of defendant's motion to suppress evidence, vacate defendant's conviction for possession of methamphetamine, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4      On August 27, 2022, at about 11 p.m., Abingdon police officer Jason Hayes

initiated a traffic stop of a vehicle being driven by defendant—a blue bus that was pulling a trailer. Hayes issued traffic citations to defendant for not having insurance, improper use of registration, and not having a valid registration. After determining that the bus and trailer had to be towed from the roadway, Hayes began an inventory search of the bus. During the search, he found a small cylindrical object, containing a substance that field tested positive for methamphetamine, and a "Y-shaped apparatus." Subsequent forensic testing on the Y-shaped apparatus revealed it contained a residue that also tested positive for methamphetamine. As a result of what was found during the traffic stop, the State charged defendant with unlawfully possessing less than five grams of methamphetamine (*id.*).

¶ 5        Defendant pleaded not guilty and elected to proceed with a bench trial. Prior to trial, she filed a motion to suppress evidence, arguing (1) a warrantless inventory search of her bus was unlawful because Hayes was not "impounding" her vehicle and, instead, "doing a private tow," (2) the inventory search was not done in good faith and was "an attempt to find incriminating evidence without a lawful search," (3) Hayes's action in opening the small cylindrical container he found violated her constitutional rights, and (4) she was unlawfully seized for five hours for a minor traffic stop.

¶ 6        In February 2023, the trial court called the matter for defendant's bench trial. It stated that by the agreement of the parties, it would simultaneously hear and consider defendant's motion to suppress evidence.

¶ 7        The State's evidence showed that on August 27, 2022, at approximately 11 p.m., Hayes executed a traffic stop of the bus after observing that the trailer it was pulling had no taillights or registration. He identified defendant as the driver of the vehicle. The bus was also occupied by defendant's six-year-old child. After Hayes informed defendant of the reasons for the

stop, defendant exited the bus to verify that the trailer's taillights were not working. She also called a friend to pick up her child.

¶ 8        During the course of the traffic stop, Hayes discovered that the trailer had no Vehicle Identification Number (VIN), the bus had a license plate that was registered to a different vehicle, and defendant had no insurance. According to Hayes, defendant represented that the bus belonged to her and that she had purchased it from a camp associated with "the Seven Day Adventist Church." When asked for proof of ownership of the bus, such as a bill of sale or copy of the title, defendant stated she had "sent that information to another state" where she wanted to have the vehicle registered.

¶ 9        At the time of the traffic stop, Hayes was a lieutenant with the Abingdon, Illinois, police department. He stated the police department's tow policy was that "if the vehicle can't be operated on the roadway, then we're gonna tow it." The policy also required that when a vehicle was towed it was to be inventoried "to make sure that nobody can be accused of damaging, stealing, or planting items in the vehicle." Hayes testified defendant's bus and trailer could not "be legally operated on the roadway" because it was nighttime and the trailer had no lights, neither the bus nor the trailer had a valid registration, and defendant had no insurance. As a result, he decided that the bus and trailer would be towed. Hayes further testified as follows:

> "I told [defendant] that we would tow the vehicle to a place of her choice. If she wanted it towed to her residence, she could do that as long as she could pay the tow driver. Otherwise, it would be towed to the tow company, and she'd have to pay the—retrieve it when she paid the tow driver."

¶ 10        When performing the inventory search, Hayes used a body-worn camera he borrowed from another law enforcement officer at the scene, Sergeant Eddie Shamblin of the

Illinois State Police. Hayes described the inside of the bus as being like "a homemade RV" with furniture, a mattress, refrigerator, kitchen cupboards with a sink and countertop, and "a lot of property." He stated that as he began to conduct the inventory search, he noticed "a cylindrical object that looked like something you'd carry pills in sitting on the counter" in the area near the sink. When he picked up the object and opened it, "a grainy substance came out" that he suspected was drugs.

¶ 11        After finding the cylindrical object, Hayes continued his search in the "bedroom" area of the bus. He found a clear plastic box containing pipes and items that he believed, from his training and experience, were drug paraphernalia. Evidence showed the box contained the Y-shaped apparatus that was later sent for forensic testing and found to have residue that tested positive for the presence of methamphetamine.

¶ 12        Hayes testified that after finding the clear plastic box, he conducted a field test on the substance in the cylindrical object, and the substance tested positive for methamphetamine. At that point, Hayes's search of the bus "went from being an inventory search to being a search for more contraband." He stated that another item of evidentiary value that he collected was a black box from the "kitchen dining-room" area that contained a glass pipe and identification cards and credit cards that belonged to "other people."

¶ 13        On cross-examination, Hayes testified he issued traffic citations to defendant for not having insurance, improper use of registration, and not having a valid registration for both the bus and the trailer. Additionally, he stated he asked Shamblin to come to the scene and "cover" the traffic stop because he knew Shamblin had "more experience with large commercial vehicles, and [he] wanted to make sure that [he] was doing things appropriately." Hayes acknowledged that after he informed defendant that the bus would be towed, defendant stated "she had a friend that

towed vehicles that could pick up the vehicle." He noted, however, that police department policy was "not to allow friends to tow vehicles" and, instead, he was required to call for "our general tow through our dispatchers."

¶ 14    Hayes further testified that, during the inventory, he wrote down several items he noticed on the bus but also used the body-worn camera to document other items. He asserted that he continued to inventory the bus after opening the cylindrical object and finding what appeared to be methamphetamine. However, "according to [his] training and experience, that's the point when the inventory became a search." Hayes maintained that he also completed the inventory once he found "the contraband." He testified defendant was arrested as a result of the traffic stop.

¶ 15    On re-direct examination, Hayes stated the bus was towed by Berg's Towing, the towing service used by the Abingdon Police Department. Further, he stated the entirety of the incident—the traffic stop, the tow, and transporting defendant to the jail—spanned approximately two and half hours.

¶ 16    During her case-in-chief, defendant presented the testimony of James Hopkins, who stated he knew defendant through a mutual friend. Hopkins testified he worked for a diesel repair and towing company, and he asserted that if defendant had called him, he would have towed her vehicle.

¶ 17    Defendant also testified on her own behalf. She stated she took possession of the bus a few months before the traffic stop. It was her second bus, and she was "converting" it into "an RV." Defendant acknowledged that the bus "had the plates on it from [her] old bus," and she asserted she was attempting get the bus registered in Vermont, where the process was cheaper than in Illinois.

¶ 18    Defendant testified she used the bus in connection with a nonprofit organization

that she formed called "Everything for Everyone" that helped "homeless and addicted" people. As a result, there were a lot of people that had access to the bus. On the day of the traffic stop, there were three other people "around the bus." Defendant acknowledged that her bus contained a lot of items, stating she "was leaving [her] house and took most of the things *** that were special to [her]." She stated there were also things that other people left on the bus, stating she always had "a bin of stuff" that was not hers. Defendant denied knowing that there was methamphetamine on the bus, asserting she would not have had it around her child. She also denied that the Y-shaped apparatus belonged to her, stating she "wouldn't even know how to use that."

¶ 19        Defendant asserted that before Shamblin arrived at the scene of the traffic stop, Hayes had issued traffic citations to her and asked if he could search her vehicle. Defendant stated she told Hayes no. She asked if she was free to leave the scene, but Hayes told her she "needed to wait." Thereafter, Hayes mentioned he had called the state police and that the bus and trailer would need to be towed. Defendant testified that because her son was still on the bus, she called Hopkins, who lived a block away, to pick him up.

¶ 20        Finally, the record shows a recording from the body-worn camera used during the traffic stop was admitted into evidence. The State played portions of the approximately one-and-a-half-hour recording during its case. Additionally, at defendant's request, the trial court viewed the recording in its entirety.

¶ 21        The recording showed Shamblin arriving at the scene wearing the body-worn camera. He conversed with Hayes, who was sitting in his squad car and writing defendant's traffic citations. Shamblin advised Hayes regarding the citations Hayes was issuing to defendant and then walked around the bus and conversed with defendant. When Shamblin returned to Hayes's squad car, Hayes voiced his suspicion that the trailer was stolen, noting that he had been unable to find a

VIN anywhere on the trailer. Shamblin replied, "I have a very strong feeling once you start inventorying this you're going to find something you don't wanna find." Hayes then stated, "That's why we're here."

¶ 22    Hayes and Shamblin further discussed the citations being issued to defendant, and Hayes stated the vehicle was being towed but not impounded as the police department's rules for impounding a vehicle had not been met. In response, Shamblin asked Hayes for defendant's driver's license, asserting he had "another trick." He stated he was going to run a driver's abstract to see if defendant had been ticketed for not having insurance within the last year. Shamblin informed Hayes that under such circumstances, Hayes would be required to both tow and impound defendant's vehicle. The recording suggests no such prior tickets were found on defendant's driving record.

¶ 23    Next, Hayes and Shamblin discussed that Hayes would tell defendant that the vehicle could be towed to her residence if she could pay the tow company, otherwise the vehicle would "go to the tow company until she can get it." Hayes stated he was towing the vehicle on the premise that it could not legally be driven on the road. Approximately 27 minutes into the recording, Hayes informed defendant that she could not legally drive her vehicle on the street, that it had to be towed, and that it could be towed to her house if she could pay the tow bill that night. Shamblin also informed defendant that the vehicle had to be inventoried.

¶ 24    Approximately 31 minutes into the recording, Shamblin gave Hayes his body-worn camera so that Hayes could use it during his inventory search. The recording showed the bus was cluttered with numerous items. Hayes began his search by documenting items on a sheet of paper. In the area of a desk, he audibly noted a printer and a monitor. He opened desk drawers and looked underneath the cushion of a desk chair. In the area of the sink, Hayes picked up a flashlight and

opened its battery compartment. From the countertop, he picked up a small, cylindrical object on a key chain and opened it, after which he wiped his hands and put on gloves. Hayes then continued his search. Approximately 42 minutes into the recording, he located the plastic container in the bedroom area of the bus that contained numerous items, including the Y-shaped apparatus.

¶ 25        Around 54 minutes into the recording, Hayes performed a field test on the substance inside the cylindrical object. He then spoke with defendant and informed her that the substance field-tested positive for methamphetamine. Defendant responded that she "didn't know that was in there." Hayes returned to the bus and continued the search. He also inventoried items inside the trailer.

¶ 26        The record shows the parties initially presented argument to the trial court on defendant's motion to suppress. Defense counsel focused his arguments on claims that defendant was unlawfully seized based upon the excessive length of the stop. He also suggested that the inventory search was a "pretext" for an investigatory search. In response, the State argued that there was a valid basis for the traffic stop and for Hayes's decision to tow the vehicle and that Hayes was following the Abingdon Police Department's tow policy.

¶ 27        Ultimately, the trial court denied the motion to suppress. Relevant to this appeal, in finding that the inventory of the vehicle was not a pretextual search for contraband, the court stated as follows:

> "[W]hen the officers found the key chain, metal cylindrical holder that had the methamphetamine that tested positive on the scene in it, that did not conclude the inventory search. They still were writing down on paper as you can see in the video and completed the inventory search all the way through the vehicle and the tailer [*sic*] which leads the Court to believe that [taking an inventory] was actually the

purpose of the—the search."

¶ 28    Following further argument of the parties, the trial court found defendant guilty of the charged offense. It determined defendant was in possession of the bus, claimed the bus was hers, and had personal items for both herself and her child on the bus. The court also found that defendant constructively possessed the substance at issue. Although the court stated that it believed defendant's testimony that a lot of people had been on the bus, it noted that defendant had a "deep understanding" of what was on the bus. The court also relied on the fact that in addition to the cylindrical object that field tested positive for methamphetamine, Hayes found "other drug paraphernalia" that also tested positive for the same drug.

¶ 29    In March 2023, defendant filed an amended motion for a new trial. Relevant to this appeal, she argued the trial court erred in denying her motion to suppress because (1) Hayes had no lawful reason to conduct an inventory search, (2) the inventory search was not made in good faith where the evidence showed Hayes intended to search the bus for evidence of a criminal offense, and (3) Hayes's actions exceeded the scope of a lawful inventory search where he "was searching and opening containers rather than simply listing items." Defendant also challenged the sufficiency of the State's evidence, arguing, in part, that the court erred in finding her guilty beyond a reasonable doubt where evidence showed numerous individuals had access to the bus.

¶ 30    In April 2023, the trial court conducted a hearing in the matter and denied defendant's posttrial motion. It then sentenced her to one year of probation.

¶ 31    This appeal followed.

¶ 32                                II. ANALYSIS

¶ 33                            A. Motion to Suppress

¶ 34    On appeal, defendant first argues the trial court erred by denying her motion to

suppress evidence. She contends the warrantless inventory search of the bus was "not constitutionally reasonable" (1) when the police were having the bus towed but not impounded and (2) where video evidence showed the inventory was not done in good faith and, instead, was a pretextual search for contraband.

¶ 35 "When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22, 104 N.E.3d 417. "A defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure," meaning "that the defendant has the primary responsibility for establishing the factual and legal bases for the motion to suppress." *Id.* In cases like the one at bar, a defendant makes a *prima facie* case by showing that there was a warrantless search of the defendant's vehicle. *People v. Gipson*, 203 Ill. 2d 298, 307, 786 N.E.2d 540, 545 (2003).

¶ 36 "If a defendant makes a *prima facie* case, the burden shifts to the State to present evidence to counter the defendant's *prima facie* case." *Brooks*, 2017 IL 121413, ¶ 22. "However, the ultimate burden of proof remains with the defendant." *Id.*

¶ 37 A trial court's ruling on a motion to suppress is subject to a two-part standard of review. *Id.* ¶ 21. Under that standard, the court's factual findings will be reversed only if they are against the manifest weight of the evidence, while its ultimate legal ruling regarding whether suppression should be granted is subject to *de novo* review. *Id.* We note "[a] finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 35, 160 N.E.3d 113.

¶ 38 Our federal and state constitutions protect against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const.1970, art. I, § 6; see *People v. Timmsen*, 2016 IL

118181, ¶ 9, 50 N.E.3d 1092 ("The fourth amendment to the United States Constitution, which applies to the states under the fourteenth amendment, and article I, section 6, of the Illinois Constitution protect people against unreasonable searches and seizures."). "Generally, a search is *per se* unreasonable if conducted without a warrant supported by probable cause and approved by a judge or magistrate." *People v. Hill*, 2020 IL 124595, ¶ 20, 162 N.E.3d 260. However, "[a]n inventory search of a lawfully impounded vehicle is a judicially created exception to the warrant requirement of the fourth amendment." *Gipson*, 203 Ill. 2d at 304.

¶ 39        Inventory searches serve three objectives: "(1) protection of the owner's property; (2) protection of the police against claims of lost or stolen property; and (3) protection of the police from potential danger." *Id.* Additionally, our supreme court has held that for a warrantless inventory search of a vehicle to be valid, three requirements must be satisfied:

> "(1) [T]he original impoundment of the vehicle must be lawful [citation]; (2) the purpose of the inventory search must be to protect the owner's property and to protect the police from claims of lost, stolen, or vandalized property and to guard the police from danger [citation]; and (3) the inventory search must be conducted in good faith pursuant to reasonable standardized police procedures and not as a pretext for an investigatory search [citation.]." *People v. Hundley*, 156 Ill. 2d 135, 138, 619 N.E.2d 744, 745 (1993).

¶ 40        "In conducting such a search, the police must be acting pursuant to standard police procedures." *Gipson*, 203 Ill. 2d at 304. Further, "[i]nventory searches can be upheld solely on an officer's unrebutted testimony that he was following standard procedures" and the procedures do not have to be in writing. *Id.* at 309.

¶ 41                          1. *No Authority for Police Impound*

¶ 42 As stated, defendant first argues there was no valid inventory search because, although the police had decided to tow her vehicle, they were not having it impounded. She maintains that since the police were not taking her vehicle into their custody, an inventory search was not constitutionally reasonable. In particular, defendant notes that Hayes offered to have the bus and trailer towed to a location of her choosing. She argues that because "the bus and trailer were never going to be in the possession of the police department," Hayes's rationale that the inventory search was necessary to protect the police from accusations "of damaging, stealing, or planting items" was inapplicable.

¶ 43 Initially, we note defendant does not challenge Hayes's authority to tow her bus and trailer because they could not legally be operated on the roadway. Further, she cites no case authority to support her specific contention on appeal—that an inventory search is unreasonable when the police direct a vehicle to be towed but do not, themselves, impound the vehicle. Under the circumstances presented, we find the United States Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. 433 (1973), is instructive.

¶ 44 In *Cady*, the Supreme Court upheld the warrantless search of a vehicle towed to a private lot. There, the defendant was a police officer for the City of Chicago, who was involved in an automobile accident in Wisconsin. *Id.* at 435-36. At the scene of the accident, law enforcement officers noticed that the defendant appeared drunk and he informed them that he, himself, was a police officer. *Id.* at 436. The officers called a tow truck to remove the defendant's disabled vehicle from the roadway and it "was towed to a privately owned garage." *Id.* Later, an officer went to the garage to search the vehicle for the defendant's service revolver, which was a "standard procedure" within the police department. *Id.* at 436-37. While searching for the service revolver, they found evidence related to a murder. *Id.* at 437.

¶ 45        In finding the warrantless search of the defendant's vehicle was reasonable, the Supreme Court stated, "two factual considerations deserve[d] emphasis." *Id.* at 442. First, it emphasized that the police had "exercised a form of custody or control over" the defendant's vehicle. *Id.* at 442-43. In particular, it noted that "[a]t the direction of the police, and for elemental reasons of safety, the automobile was towed to a private garage." *Id.* at 443. Second, the court pointed out that the search "to retrieve the revolver was 'standard procedure in (that police) department,' to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* Additionally, it held that the "fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means [did] not, by itself, render the search unreasonable." *Id.* at 447. In conclusion, the court stated that a search "of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained." *Id.* 447-48.

¶ 46        In *People v. Clark*, 65 Ill. 2d 169, 357 N.E.2d 798 (1976), our own supreme court upheld a warrantless search of a vehicle under similar circumstances. There, the defendant's car stalled on the roadway. *Id.* at 171. A police officer arrived on the scene as the defendant was trying to get the car started and subsequently arrested the defendant for illegally transporting alcoholic liquor. *Id.* at 171-72. Because the car was not legally parked and blocking traffic, "the arresting officer called a commercial towing company to tow it to a pound." *Id.* 172. After the tow truck arrived, the officer conducted an inventory search of the vehicle, finding stolen bank checks. *Id.* The supreme court found the search reasonable and not in violation of the fourth amendment. *Id.* at 174. In so holding, it relied on testimony that "that inventory searches were routinely made in all cases where it is necessary to tow a car away." *Id.* at 175.

¶ 47    Here, as described in *Cady*, the police were exercising a form of custody and control over defendant's vehicle. In particular, the defendant's bus and trailer were being towed at the direction of the police pursuant to a standard police department policy, and the police selected the towing service to be used. Although defendant suggests on appeal that the police were not exercising any control or responsibility over her vehicle because they "were going to tow the [bus and trailer] to a place of [her] choosing," the record does not support that assertion. Rather, it shows only that the police gave defendant the option of having the bus and trailer towed to a place of her choosing *if* she could pay the tow driver. Otherwise, defendant was informed that the bus and trailer would remain out of defendant's custody and be towed to the tow company's premises. Nothing in the record shows that defendant chose any particular place to have her vehicle towed or that she had the ability to pay for the tow. Defendant had the burden of proof with respect to her motion to suppress and failed to meet that burden with respect to this specific claim.

¶ 48    Next, we also reject defendant's contention that the purpose for the inventory search in this case, as expressed by Hayes, was inapplicable to the facts presented. Hayes testified that not only was it the police department's policy to tow vehicles that could not be operated on the roadway, but the department's policy further required officers to inventory the towed vehicle "to make sure that nobody can be accused of damaging, stealing, or planting items in the vehicle." Again, where the bus and trailer were out of defendant's custody and control and, instead, in the custody and control of the police department and its selected tow service, such concerns were relevant. See *Girardi v. Commonwealth*, 221 Va. 459, 464, 270 S.E.2d 743, 746 (1980) ("Where *** the seized vehicle will be towed by a private operator to a private impoundment lot, there is good reason for the police to make an inventory search before they relinquish even temporary control over the car."); *United States v. Privett*, 68 F.3d 101, 104 (5th Cir. 1995) ("[S]ecurity of

the contents [of a vehicle] is the same whether the contents were inventoried prior to delivery of the conveyance to a third-party wrecker driver or occupant of the vehicle.").

¶ 49                                 2. *Pretextual Search for Contraband*

¶ 50        Defendant next argues that the inventory search of her vehicle was not valid because it was a pretextual search for contraband. In particular, she notes the recording from the body camera worn during the traffic stop showed (1) Shamblin and Hayes discussing the possibility of Hayes finding "something you don't want to find" when inventorying the bus, (2) Shamblin and Hayes discussing whether the bus and trailer could be legally impounded and looking for ways to have the bus and trailer impounded, and (3) Hayes conducting an inventory search in a way that allowed him to search for contraband. As to defendant's latter claim, she contends that Hayes documented items of little or no value, suggesting he was just "going through the motions" of an inventory search "and making note of random items to make it look less like he was searching for contraband." She also points out that Hayes searched places where he was unlikely to find items of value, like the battery compartment of a flashlight, beneath the cushion of a chair, and inside the small cylindrical object. Defendant contends Hayes's search was unreasonable where no evidence showed the police department had a policy that required the opening of small containers during an inventory search.

¶ 51        As set forth above, an "inventory search must be conducted in good faith pursuant to reasonable standardized police procedures and not as a pretext for an investigatory search." *Hundley*, 156 Ill. 2d at 138. "An inventory search must be limited *** to the purposes for which it is conducted." *People v. Reincke*, 84 Ill. App. 3d 222, 225, 405 N.E.2d 430, 432 (1980). Ultimately, "[a] crucial factor in determining the validity of an inventory search is whether the search is actually a pretext for concealing an investigatory motive. Where the purpose of the search is

exploratory in nature it will be deemed illegal and the evidence so found must be excluded." (Internal quotation marks omitted.) *Id.*

¶ 52    On appeal, defendant relies on *Florida v. Wells*, 495 U.S. 1, 2 (1990), where the United States Supreme Court considered the propriety of an inventory search during which the police forced open a locked suitcase that was found in the trunk of the defendant's vehicle, discovering a bag of marijuana. Relying on an earlier finding in the case by the supreme court of Florida that the police agency conducting the search "had no policy whatever with respect to the opening of closed containers encountered during an inventory search," the Supreme Court determined the marijuana evidence should have been suppressed. *Id.* at 4-5. It held "that absent such a policy, the *** search was not sufficiently regulated to satisfy the Fourth Amendment." *Id.* at 5. In reaching its decision, the court stated as follows:

"Our view that standardized criteria *** or established routine [citation] must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime,' [citation].

But in forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion. [I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of

lost, stolen, or vandalized property, and to guard the police from danger. [Citations.] A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." (Internal quotation marks omitted.) *Id.* at 4.

¶ 53      Our supreme court has applied *Wells* on two occasions, both of which defendant cites on appeal. First, in *Hundley*, 156 Ill. 2d at 136, a trooper with the Illinois State Police observed the defendant's unattended vehicle in a ditch and determined that it had been involved in a "one-car accident." Prior to the vehicle being towed, the trooper conducted an inventory search. *Id.* at 137. During the search, "he found a closed, snap-top cigarette case which he opened," discovering "a snorting tube containing cocaine." *Id.* In connection with a motion to suppress the drug evidence, "[t]he trooper testified that he opened the cigarette case because in his experience he had found women often put their drivers' licenses and money in these containers." *Id.* The trial court also received evidence that the State police had policies and procedures that applied to inventory searches, which stated as follows:

          "An examination and inventory of the contents of all [vehicles] towed *** shall be made by the officer who completes the Tow-In Recovery Report. This examination and inventory shall be restricted to those areas where an owner or operator would

- 17 -

ordinarily place or store property or equipment in the [vehicle]; and would normally include front and rear seat areas, glove compartment, map case, sun visors, and trunk and engine compartments." (Internal quotation marks omitted.) *Id.*

¶ 54    On review, the supreme court reversed the trial court's decision to suppress the drug evidence. *Id.* at 138-39. The court discussed *Wells*, and stated as follows:

"Considering the applicable law as applied to the facts of the instant case, we believe that the general order of the Illinois State Police is adequate to the situation. More particularly, based on the unique circumstances of the towing of an unattended vehicle following a wreck, we believe that the officer's decision to open the cigarette case, because in his experience he had found women often put their drivers' licenses and money in these containers, was a reasonable exercise of judgment on the officer's part." *Id.* at 139.

¶ 55    Second, in *Gipson*, 203 Ill. 2d at 301, a law enforcement officer conducting an inventory search of the defendant's vehicle opened bags found in the trunk, discovering "what appeared to be crack cocaine." In explaining the police department's policy relating to an inventory search, the officer stated as follows: " 'We are required to check the passenger compartment, and trunk area for any valuables, or just for our own—we don't want anything to leave us that might be of value without checking it first and putting it down on the tow sheet.' " *Id.*

¶ 56    In considering whether suppression of the drug evidence was required, our supreme court in *Gipson* cited to both *Wells* and *Hundley*. *Id.* at 309-10. It found suppression was not warranted under the facts presented because the officer testified that police policy required him "to check the passenger compartment and the trunk for valuables," and such a policy obviously "require[d] the police to open any containers that might contain valuables." *Id.* at 311. The court

found the policy before it "more specific than the one at issue in *Hundley*," as it referred to
" 'valuables' " rather than simply "the contents of the vehicle." *Id.* The court further concluded as
follows:

> "The point of *Hundley* is that a policy requiring an inventory of all of the contents
> of a vehicle is sufficient to allow the opening of closed containers. Here, the policy
> of inventorying anything of value found in the passenger compartment or trunk was
> sufficient to allow the opening of containers that may contain valuables." *Id.*

¶ 57　　　　Turning to the facts presented in this case, we agree with defendant that the manner
in which Hayes conducted the inventory search suggests an investigatory motive. As noted by
defendant, the recording from the body-worn camera showed Hayes, at the outset of his search of
the bus, opening the battery compartment of a flashlight, lifting the cushion of a chair, and opening
the small cylindrical object. However, there was no testimony from Hayes, or other evidence, that
indicated those actions served the objectives Hayes identified under the Abingdon Police
Department's inventory policy, *i.e.*, protecting against accusations of damaged or stolen property.
Moreover, although Hayes clearly identified valid objectives of an inventory search, evidence was
lacking regarding any policy that addressed the scope of such a search, and in particular the
opening of closed containers such as the battery compartment of a flashlight or the small
cylindrical object.

¶ 58　　　　We find this case is distinguishable from *Hundley*, where a policy was identified
that indicated the police were required to inventory all of a vehicle's "contents" in "areas where
an owner or operator would ordinarily place or store property." (Internal quotation marks omitted.)
*Hundley*, 156 Ill. 2d at 137. Additionally, unlike the present case, *Hundley* also involved testimony
from the inventorying officer, who provided an explanation for his decision to open the closed

container that was reasonable in the context of the search being conducted—an inventory of an unattended, wrecked vehicle. *Id.* at 139.

¶ 59        We also find *Gipson* factually dissimilar from the present case. As noted, the supreme court held in that case that "the policy of inventorying anything of value found in the passenger compartment or trunk [of a vehicle] was sufficient to allow the opening of containers that may contain valuables." *Gipson*, 203 Ill. 2d at 311. Although we may assume that the inventory policy at issue here—which was aimed at protecting the defendant's items from being damaged or stolen—required documenting items of value, we cannot say that the manner in which Hayes's search was conducted was limited solely to locations or containers where valuables might reasonably have been found. Hayes's actions in opening the battery compartment of a flashlight and lifting the pad of a chair, in particular, suggest more of an impermissible "general rummaging in order to discover incriminating evidence" than a regulated search "designed to produce an inventory." *Wells*, 495 U.S. 4.

¶ 60        Below, the trial court found the inventory search was conducted in good faith and not as a pretextual search for contraband. In so finding, the court noted that once Hayes discovered the cylindrical object with the substance that field-tested positive for methamphetamine, he "completed the inventory search all the way through the vehicle and the tailer [*sic*]." Ultimately, we find that an opposite conclusion from the one reached by the court is clearly evident.

¶ 61        Here, the continued documentation of items after the discovery of contraband does not necessarily warrant a finding that the scope of the search was proper. As noted above, no evidence was presented showing that the manner in which Hayes conducted his purported inventory search was authorized by any standardized police department policies or practices. Again, we find that from its outset, Hayes's search—involving the opening of the battery

compartment of a flashlight and other small objects and the lifting of the pad of a chair—was exploratory in nature and more indicative of a "general rummaging in order to discover incriminating evidence" rather than a regulated search "designed to produce an inventory." *Id.*

¶ 62 Further, we note that Hayes identified two different points at which his purported inventory search became a probable cause search for contraband. On direct examination, Hayes testified the change occurred approximately 23 minutes into his search of the bus after the grainy substance he found in the cylindrical object field-tested positive for methamphetamine. However, on cross-examination, he indicated his search became a probable cause search for contraband about six or seven minutes into his search when he first opened the cylindrical object and found the grainy substance. Our review of the record reflects no discernible difference in the manner in which Hayes conducted what he described as an inventory search versus his later search based on probable cause (at either of the two points he described). Under the facts presented, Hayes's contradictory testimony is evidence that further weighs in favor of finding that his search was prompted by an investigatory motive.

¶ 63 On appeal, the State does not address defendant's claims regarding the manner in which Hayes conducted the inventory search as shown on the body-worn camera or the specific case authority cited by defendant on that issue. Given these circumstances, we hold the trial court's finding that Hayes's inventory search was not a pretextual search for contraband is against the manifest weight of the evidence. Consequently, we find defendant met her burden with respect to her motion to suppress and that the court erred in denying that motion.

¶ 64                                B. Sufficiency of the Evidence

¶ 65 As noted, defendant additionally argues on appeal that the trial court erred in finding her guilty of the charged offense. However, given our determination that the court erred in

denying defendant's motion to suppress, it is unnecessary for us to reach this issue.

¶ 66                                    III. CONCLUSION

¶ 67          For the reasons stated, we reverse the trial court's denial of defendant's motion to suppress, vacate defendant's conviction for possession of methamphetamine, and remand for further proceedings.

¶ 68          Reversed and vacated; cause remanded.